PACCAR, INC., AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22221–82.     Filed November 13, 1985.

*John T. Piper* and *Joseph A. McIntosh*, for the petitioner.
*Blake W. Ferguson, Michael R. McMahon*, and *Thomas N. Tomashek*, for the respondent.

---

SCOTT, *Judge*: Respondent determined deficiencies in petitioner's income taxes for the years and in the amounts as follows:

| Year | Deficiency |
| --- | --- |
| 1975 | $566,352 |
| 1976 | [1]1,578,202 |
| 1977 | 1,117,128 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision: (1) Whether petitioner's transfer of surplus and obsolete material to SAJAC, an unrelated warehouse facility, constituted a sale entitling petitioner to claimed deductions for inventory losses based on the scrap value of the materials transferred; (2) whether the 10-percent purchase discount petitioner granted its wholly owned subsidiary upon the sale to it of trucks and parts which were resold by the subsidiary in the foreign market represented a discount that would have been afforded unrelated parties dealing at arm's length and, if not, what is the proper adjustment, if any, under section 482.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under the laws of the State of Washington. It is engaged in the manufacture and distribution of transportation equipment. Petitioner operates through separate and independent divisions. At the time of filing its petition in this case, petitioner maintained its principal place of business in Bellevue, Washington. Petitioner and its subsidiaries filed consolidated Federal income tax returns on Forms 1120 for taxable years 1975, 1976, and 1977, with the Internal Revenue Service Center, Ogden, Utah.

Paccar Parts, a division of petitioner, sells heavy duty truck parts. Dart Truck Co. (Dart), a division of petitioner during the years in issue, is engaged in the manufacture and distribution of above-ground mining vehicles. Wagner Mining Equipment

---

[1]In the stipulation, the parties agreed that pursuant to the statutory notice of deficiency dated June 14, 1982, respondent determined a deficiency for tax year 1976 in the amount of $1,578,128.

[2]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

Co. (Wagner), a division of petitioner, is engaged in the manufacture and distribution of underground mining vehicles. Kenworth Truck Co. (Kenworth) and Peterbilt Motors Co. (Peterbilt), both divisions of petitioner, are engaged in the manufacture of trucks. Pacific Car & Foundry Co. (PC & F), also a division of petitioner, is engaged primarily in the manufacture of rail cars.

During the years in issue in this case, petitioner's inventory was valued on the LIFO method of accounting.

### 1. Transfer of Inventory to SAJAC

SAJAC Company, Inc. (SAJAC), is a Wisconsin corporation formed in 1971. SAJAC is in the business of storing slow moving excess parts from the inventory of large manufacturers throughout the United States. On November 15, 1976, November 30, 1976, and March 23, 1977, three divisions of petitioner, Paccar Parts, Dart, and Wagner, respectively entered into written agreements with SAJAC for the disposition of certain inventory. These agreements provided as follows:

AGREEMENT

This agreement, between ____, a division of PACCAR Inc., and SAJAC Company, Inc., whose principal place of business is at 1100 Green Valley Road, Beaver Dam, Wisconsin 53916.

____ hereby sells and SAJAC hereby accepts on the following terms and conditions set forth selective excess, inactive or unusable parts hereinafter referred to as scrap material.

1. SAJAC shall from time to time purchase from ____ scrap material at a price to be determined by the then prevailing market price in the Chicago area for scrap metals of like kinds, quality and weight.

2. Title to, property in and ownership of all scrap material shall pass to SAJAC upon delivery to a designated carrier at any ____ regional warehouse. All goods are sold F.O.B. seller's warehouse, and all risk of loss shall be borne by SAJAC.

3. SAJAC Company is not, in any manner, expressed or implied, a bailee of the scrap material, nor is SAJAC in any way an agent of ____.

4. ____ retains the right to repurchase any portion of the scrap material so sold for a period of at least four years after delivery of such goods to SAJAC. SAJAC will advise ____ of any other disposition of material during this period of time.

5. The repurchase cost to ____ shall not exceed 90% of ____ last acquisition cost, adjusted for inflation. If SAJAC's invoices to PACCAR exceed 10% of the inventory purchased from ____ in any calendar year, SAJAC will reduce its selling price on parts for the remainder of the year to 70% of PACCAR's

cost. If SAJAC's invoices to PACCAR exceed 20% of the inventory purchased from ____ in any calendar year, SAJAC will reduce the selling price on parts for the remainder of the year to 50% of PACCAR's cost.

6. After the expiration of said four year minimum period, SAJAC agrees to dispose of such goods by destroying, scrapping, dismantling, mutilating, or recycling in a commercially accepted manner. All of such goods shall be dismantled and otherwise made unusable. SAJAC agrees to notify ____ when goods are to be disposed of and will allow a PACCAR representative to be present at SAJAC facilities to witness disposal of said goods.

7. This Agreement shall inure to the benefit of and be binding upon the parties, their successors and assigns.

8. This Agreement may be canceled by either party by giving written notice to the other party, provided that such cancellation shall not be effective until sixty days after receipt of such written notice. In the event this Agreement is canceled, all goods then in the possession of SAJAC shall be destroyed, disposed of, scrapped, recycled or otherwise made unusable in accordance with paragraph 6.

Beginning in 1976, parts were transferred to SAJAC by the divisions of petitioner which had entered into the above agreement with SAJAC.

The chart on page 758 is a random sample of 10 parts transactions occurring in 1978 as if the 90-percent repurchase price applied between Paccar Parts and SAJAC.

A random parts transactions sample for 1976 and 1977 would show roughly similar proportional relationships between SAJAC's cost for the part and the reacquisition cost of petitioner.

Petitioner treated its transfers of material to SAJAC as sales for both accounting and tax purposes. SAJAC treated all transfers from petitioner as purchases for both accounting and tax purposes and accounted for these materials by including them in its inventory. Petitioner and SAJAC treated any "repurchases" as purchases and sales, respectively, for accounting and tax purposes.

During the years 1976 and 1977, SAJAC had no regional warehouse on the west coast. Any parts and materials petitioner disposed of to SAJAC from its west coast facilities were shipped to SAJAC's warehouses located in the Midwest, including Oklahoma. During 1976 and 1977, petitioner paid the shipping costs on materials it sent to SAJAC from its west coast locations.

Both the Kenworth and Peterbilt divisions of petitioner built heavy-duty trucks for sale domestically and abroad. In

| Parts number and description | Balance in PACCAR Parts inventory before shipment to SAJAC Chicago warehouse | Quantity of part sent to SAJAC from Chicago warehouse | Quantity of part to be sent to SAJAC from other PACCAR Parts warehouses | Approximate weight of part in pounds | SAJAC cost to acquire part from PACCAR Parts at 0.02/pounds | PACCAR Parts division cost to reacquire part from SAJAC | Price billed PACCAR dealer for part |
|---|---|---|---|---|---|---|---|
| K053-217CP Bracket Chrome | 2 | 2 | 0 | 1 | $.02 | $ 3.69 | $ 7.85 |
| 904940-1 Slip Joint | 1 | 1 | 0 | 42 | .84 | 42.24 | 66.97 |
| 01871419 Post Assy – Side RH | 4 | 4 | 0 | 19 | .38 | 7.91 | 19.24 |
| 01871421 Spacer | 5 | 5 | 0 | 2 | .04 | 1.00 | 2.61 |
| K188-61 STR Pump | 5 | 4 | 1 | 37.5 | .75 | 160.29 | 395.69 |
| 01869585 Striker Plate | 9 | 5 | 4 | 1 | .02 | 24.46 | 2.13 |
| K054-1557 Bracket E haust | 12 | 12 | 0 | 40 | .80 | 30.16 | 65.76 |
| K054-1094 BRKT - EXL | 4 | 4 | 0 | 2 | .02 | .27 | .62 |
| K218-436 Sill – Floor L.N./K1000 | 2 | 2 | 0 | 20 | .40 | 14.98 | 38.95 |
| 75828 Radiator Assy | 1 | 1 | 0 | 255 | 5.10 | 363.98 | 589.92 |

addition, they sold replacement parts for these trucks. Paccar Parts warehouses and distributes heavy-duty truck parts for Kenworth and Peterbilt trucks and sells these parts to franchised dealers and overseas customers by using the facilities of petitioner's three marketing divisions, Kenworth, Peterbilt, and Paccar International. The trucking industry has a policy of supplying replacement parts for trucks for 7 years from the date the truck was manufactured. Kenworth exceeds this standard and in some cases has supplied replacement parts for Kenworth trucks that were more than 25 years old.

When a Peterbilt or Kenworth customer ordered a replacement part which was not in stock at Paccar Parts or otherwise available from petitioner, or from other vendors who sold parts to petitioner, Kenworth or Peterbilt would either manufacture the part in single or small lot quantities to satisfy the customer's need or have the part built in one of their fabrication shops. Single or small run manufacture disrupted the manufacture of current production parts, involved expensive setting up of machines to manufacture the part, took from 2 to 6 weeks, and resulted in the customer receiving a part at an inflated cost and after a long wait.

Paccar Parts could not accurately project the demand for slow moving, surplus, and obsolete parts. Executives at the company knew, however, from past experience that some of the parts scrapped or disposed of as surplus and obsolete would be required to service Kenworth or Peterbilt trucks. Paccar Parts wanted to keep a lifetime supply of all usable replacement parts for Kenworth and Peterbilt trucks available, even if the parts were slow moving, surplus, or obsolete.

Paccar Parts has 64,459 part number records carried on its computer file. At least 26,666 of these are not located on any of its warehouse shelves but are available at SAJAC or from another source.

In 1976 Paccar Parts issued for use by its personnel in its inventory control and service parts organization section, a phamplet entitled "The Paccar Parts Inventory Control System." This pamphlet stated in part:

At PACCAR Parts we use six inventory classes that are recalculated each month based on the most current 12 months of demand for the part. Thus a particular part can change its inventory class each month. The inventory classes are broken into two groups:

Inventory Class

$$\left.\begin{array}{l} \text{A)} \\ \text{B)} \\ \text{C)} \end{array}\right\} = \text{Stocking Parts} \quad \text{(Parts we hold in our warehouse for anticipated sales)}$$

$$\left.\begin{array}{l} \text{D)} \\ \text{E)} \\ \text{F)} \end{array}\right\} = \text{Non-stocking Parts} \quad \text{(Parts we try not to have on hand in any of our warehouses)}$$

The process we use to decide which parts will be stocking parts is explained in the section called "stocking logic."

Additionally, each letter has a specified meaning within these two big divisions. The stocking parts are divided into A, B, or C based on the forecasted annual sales and the cost of the part. To decide which class a part falls into, the computer calculates the following:

Forecast Annual Sales = (Forecast for next month $\times$ 12) $\times$ (Our unit cost)

The stocking part is then placed into one of the three categories based on the following:

If forecast annual sales is greater than $6000 = A
If forecast annual sales is between $1000 and $5999 = B
If forecast annual sales is below $1000 = C

We spend a great deal of the Planners time making sure we have the "A" items on hand. We spend relatively little time on "C" items because they will generate less than $150 a year in total sales.

The non-stocking items also have special meanings. While we try not to have these parts in stock, they do account for about 20% of our annual sales. Below is an explanation of what each of the three letters means.

Inventory Class

D = Part has been on our computer file at least one year and has not had sufficient demand in the last year to justify stocking it. It is an old part for which the demand has fallen.

E = Part that has been on the file less than one year and has not as yet accumulated enough demand to justify stocking it. It is a new part.

On April 9, 1976, Jack Lemon, the owner of SAJAC, wrote a letter to Carl Orlob, manager of material disposition at Paccar Parts. The letter stated as follows:

Thank you for your interest in our unusual service. We are a LONG TERM DORMANT WAREHOUSE that provides manufacturers with all of TAX and SPACE SAVING benefits of scrapping excess and inactive non-current inventory—yet they retain its availability for possible future sale.

We are LONG TERM because our customers have generally owned our inventory 1 to 3 years before we buy it—and we keep it another 4 to 12 years.

DORMANT WAREHOUSE describes our special low cost storage facility. Since all our inventory is obsolete, we use dense storage systems in low cost buildings that keep our warehousing costs substantially below our customers.

TAX BENEFITS vary depending whether our customer uses LIFO or FIFO, and whether the inventory is "excess" or "inactive".

SPACE SAVING because 80% of our customer's service parts inventory produces only 20% of his sales. SAJAC frees up his space for more profitable use.

Some manufacturers use our dealer parts return program. We will

* receive
* inspect and count
* sort into active and obsolete inventory
* purchase and store the obsolete—eliminating your handling
* repackage the active
* ship it to you, grouped by your warehouse locations, ready for your shelves.

During the past 6 years we have filled 150,000 Sq. Ft. of warehouses with an estimated $11 million of manufacturers inventory. We will sell only to our manufacturers, but we drop ship for them anywhere in the United States or Canada—by air or surface.

The enclosed "Dormant Inventory Proposal" describes how we purchase large quantities of inactive inventory, and sell back the few items needed for customer service each year.

* * * * * * *

SUBJECT: Dormant Inventory Proposal

We are submitting the following proposal for your consideration and acceptance, to purchase your inactive and excess inventory.

1. SAJAC will purchase mutually agreed upon inventory at a preestablished price.

2. SAJAC will transport and store their inventory in warehouses, where it will be available for resale.

3. You may purchase any portion of our inventory at the following:

1. ____% of your current cost.

2. ____% standard cost at time of sale to SAJAC plus an inflation factor.

3. ____% of your selling price.

4. This agreement may be canceled by either party by notification 60 days in advance in writing. Upon cancellation, SAJAC will dispose of all their inventory.

At about the same time that Mr. Lemon made the proposal to Paccar Parts, he made similar proposals to Wagner and Dart.

Mr. Orlob arranged a meeting between Mr. Lemon and Don Luther, who was the materials manager of Paccar Parts at that time. At this meeting, Mr. Lemon explained that SAJAC was willing to "buy" Paccar Parts' obsolete parts at a scrap price figure, which was derived from a publication used by the industry, Iron Age Magazine. SAJAC proposed warehousing that inventory and holding it for a period of up to 14 years. If a part in a skid (container) of material was "resold" to Paccar Parts within 5 years, SAJAC would keep the whole skid up to 14 years. SAJAC would "sell" those parts,. or whichever parts Paccar Parts needed, back to Paccar Parts at 90 percent of Paccar Parts' current production cost.

On November 8, 1976, Hank Uhthoff, who was in charge of disposition of materials at Paccar Parts, in an interoffice communication to the staff at Paccar Parts, gave the following general review of the SAJAC program:

BACKGROUND

The Sajac Company maintains long term dormant warehouses which provides manufacturers with tax and space saving benefits of scrapping excess and inactive inventory, yet retaining its availability for possible future sales.

We view this proposal as a cost effective method of supplying the domestic and international aftermarket with certain fabricated and vendor parts in a timely manner to price conscious dealers. Without such a program, our customers are now faced with exceedingly long factory/vendor lead times at sometimes exorbitant prices. This program will allow us on selective items:

1. Ability to provide better service,
2. At a reasonable price, with
3. Reduced impact on our factories regarding set up costs and line interruption for one each quantities,
4. Flexibility of scrapping and retrieval,
5. Increased warehouse shelf space,
6. Minimized carrying costs which maximize capital opportunities, and,
7. Effective inventory management.

SAJAC COMPANY

Dormant or morgue warehousing describes Sajac's special low cost storage facility. Because all of Sajac's inventory is obsolete (aged), dense storage systems are used in low cost buildings which keeps their warehousing costs substantially below their customers.

Sajac customers have generally owned their inventory one to three years before Sajac purchases it at scrap prices. Sajac maintains the material another four to twelve years.

Currently, Clark Equipment, Vendo, and Addressograph Companies, to name a few, utilize Sajac's dealer direct ship program. Sajac:

Receives and racks,
Will cardex inventory,
Accepts incoming orders,
Inspects, cleans, and paints if required,
Repackages items, and
Ships back to us or direct to dealers using supplied labels.

During the past six years, Sajac has filled over 150,000 square feet of warehouses with an estimated $11 million of manufacturer's inventory. Sajac sells only to their manufacturers and drop ships by surface or air as requested.

FACILITY INSPECTION

On June 16, 1976, Carol Orlob and Hank Uhthoff traveled to Beaver Dam, Wisconsin to view Sajac's office and current dormant warehouse. A modern prefab facility with 22,000 square feet of dense storage, 22 feet in height. We left Sajac satisfied beyond a doubt that they are capable of fulfilling their claims. Sajac is a well organized and structured business enterprise.

SAJAC'S BENEFIT

In consideration of their service, Sajac will sell back to PACCAR Parts, any of our inventory at 75% of our on-file acquisition cost, adjusted periodically by a predetermined inflation index.

On August 9, 1976, Mr. Uhthoff described pertinent parts of the SAJAC proposal to the tax manager of the corporate legal department at Paccar Parts as follows:

In consideration of their service, Sajac will sell back to PACCAR Parts, any of our inventory at 90% of our on-file acquisition cost which will be adjusted periodically by a predetermined inflation index.

\* \* \* \* \* \* \*

*Control of Material*: Contractually we cannot maintain a semblance of control and still enjoy our arms length legal consideration of "a sale". However, by agreement, Sajac will scrap material at the end of a specified time, witnessed by a PACCAR Parts employee or agent.

Verbally, Sajac agrees to resell the material to us at scrap price to fulfill any future IRS disagreement of our position. \* \* \*

\* \* \* \* \* \* \*

*Sajac will not sell to anyone but PACCAR Parts. This is their current posture with existing customers. We realize that this cannot be contractually specified and still allow for an "arms length" position.*

\* \* \* \* \* \* \*

* * * IRS regulation precludes write off of scraped material that has *not* been defaced or made unusable. It is acknowledged that we are in technical violation of this rule in our current scrap program confirmed by recent Internal Audits. However, Accounting considers our risk to be minimal and insignificant contrasted to total inventory dollar figure.
[Emphasis supplied.]

Paccar Parts controlled what items were shipped to SAJAC. SAJAC never rejected any materials sent to it by Paccar Parts, Dart, or Wagner.

On December 22, 1977, in a yearend review of petitioner's arrangement with SAJAC, Mr. Uhthoff stated the following:

During the past 14 months, the Parts Division has scrapped to SAJAC 2600 line items valued at $514,000.00—material that normally would have been defaced and scrapped after exerting all disposal alternatives.

Since February 1977, we have repurchased, for firm backorders, 486 line items. Of these, 357 items or 73% were proprietary items of which 307 were emergency directs to dealers.

The following chart shows the SAJAC "purchases" and "resales" of petitioner's parts from 1976 through 1982:

|  | *1976 through 1982* | | |
| --- | --- | --- | --- |
|  | *Total pounds purchased by SAJAC* | *Total pounds repurchased by PACCAR divisions* | *Repurchase percentage* |
| Braden Winch Co. | 122,141 | 4,682 | 3.8 |
| Dart Truck Co. | 1,250,070 | 391,454 | 31.3 |
| PACCAR Parts | 1,164,474 | [3]320,692 | 27.5 |
| Wagner Mining Equipment Co. | 177,297 | 16,504 | 9.3 |
| Dynacraft | 243,509 | None | 0.0 |
| Pacific Car & Foundry Co. | 76,639 | 411 | 0.5 |
|  | 3,034,130 | 733,743 | 24.2 |

After the promulgation of the decision of the Supreme Court in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), SAJAC published and distributed a brochure entitled "The SAJAC System and the Internal Revenue Code." This brochure states in part:

SAJAC Company, Inc. is in the business of purchasing and holding for resale the excess parts inventories of various manufacturers. As a purchaser of excess inventories, SAJAC provides its manufacturing customers with the opportunity to obtain the following:

---

[3]Includes 90,206 pounds repurchased by Kenworth Truck Co. division.

Relief from the financial and managerial burden of warehousing and inventorying spare parts.

A readily accessible source of replacement parts from which to service the future needs of their customers.

A tax deductible inventory loss.

In order to efficiently service the needs of its customers, a manufacturer must either maintain an inventory of replacement parts or have a readily accessible source of spare parts available. While a manufacturer might prefer to have its own inventory of parts, maintaining a complete inventory is expensive. The manufacturers' after-tax cost of maintaining such an inventory was increased significantly as a result of the 1979 United States Supreme Court decision in *Thor Power Tool Co. v. Comm.*

Prior to *Thor*, excess inventories were routinely written down by manufacturers to their net realizable value based upon management's business experience and forecasts of future demand. The tax benefits which flowed from these write-offs reduced the net cost of maintaining the inventories on hand. With the Supreme Court decision in *Thor*, however, these tax benefits are no longer available to the manufacturer who retains an inventory in excess of its immediate needs.

\*     \*     \*     \*     \*     \*     \*

### *The Impact of Thor on Manufacturers*

In light of the *Thor* decisions, manufacturers will be required to make some important decisions regarding the manner in which they will handle their excess inventories. The usual alternatives available to the manufacturer include maintaining, scrapping,' or selling its excess inventory. By maintaining an inventory, the manufacturer is able to provide prompt service to its customers. By scrapping the inventory, the manufacturer is able to realize significant tax benefits from inventory write-offs.

By selling the inventory to an independent firm specializing in buying excess inventory, however, the manufacturer is able to enjoy the benefits of both maintaining and scrapping the inventory while avoiding the costs associated with these alternatives.

### *SAJAC Offers Another Alternative*

The benefits accruing to the sale of excess inventory to an independent firm such as SAJAC are significant. First, the manufacturer is relieved of the financial and managerial burden of inventorying and warehousing spare parts. Second, while the manufacturer no longer has control over the spare parts it might need in the future, these parts are still available through SAJAC at a price usually less than current market value. Finally, as a result of selling excess inventory to SAJAC at scrap metal prices, the manufacturer will have incurred a tax deductible inventory loss substantiated by an actual sale.

When a manufacturer enters into an inventory sales agreement with SAJAC, the following sequence of events occurs:

For scrap value, SAJAC purchases and thereby obtains title and all rights to mutually agreed upon inventory.

For consideration received, the manufacturer, in turn, relinquishes title and all rights to the inventory thereby sold.

SAJAC stores the inventory purchased for purposes of future resale or scrapping as determined by SAJAC.

The manufacturer has the right at any time to purchase from SAJAC any or all of the inventory then held by SAJAC at a price equal to approximately 90 percent of the current cost of manufacturer or purchase.

Under the terms of the purchase agreement, SAJAC is not required to retain the inventory it purchases for any specific period of time. *A sale of inventory to SAJAC pursuant to an agreement requiring SAJAC to retain the inventory for a manufacturer might not satisfy the requirements of the Regulations and Thor with regard to deductible inventory losses.* Accordingly, the inventory is retained, sold, or scrapped as SAJAC determines. It is SAJAC's policy, however, to retain the inventory it purchases for a reasonable length of time, taking into consideration the anticipated demand for such inventory.

## SAJAC Satisfies Government Requirements

The Treasury Regulations permit taxpayers to write down normal inventories below market and thereby recognize a loss when the goods are offered for sale or sold at prices below market. The Supreme Court in *Thor* strictly interpreted this Regulation and held that:

"because Thor provided no objective evidence of the reduced market value of its 'excess' inventory, its write-down was plainly inconsistent with the Regulations, and the Commissioner properly disallowed it."

A sale of inventory to SAJAC at scrap metal prices provides objective evidence of the reduced market value of a manufacturer's excess inventory. A sale to SAJAC is also a complete and closed transaction since under the terms of the purchase agreement the seller's rights to and control over the inventory absolutely expire. Accordingly, sales of excess inventory to SAJAC pursuant to SAJAC's inventory purchase agreement should satisfy the requirements of both the Regulations and the courts thereby giving rise to tax deductible inventory losses.

## The SAJAC Opportunity

SAJAC has much to offer the manufacturer with inventory which exceeds its immediate needs. Upon selling its inventory to SAJAC, the manufacturer is relieved of the burden of warehousing and inventorying these excess goods. In addition, while SAJAC acquires full title and rights to the inventory it purchases, the manufacturer may repurchase this inventory or any part thereof for future use.

A sale to SAJAC at scrap metal prices provides objective evidence of the inventory's reduced market value, and is a complete and closed transaction. Accordingly, sales of excess inventory to SAJAC should satisfy the requirements of the IRS and the courts thereby affording significant tax benefits to

manufacturers. Noted tax writers agree with this conclusion and have confirmed that:

"bona fide sales to an unrelated distributor at arm's length prices should give rise to deductible tax losses."

[Fn. ref. omitted; emphasis added.]

Paccar Parts had numerous potential markets for surplus and obsolete proprietary parts. The parts could either be sold through Peterbilt and Kenworth, sold as scrap to local scrap dealers, or transferred to SAJAC. In addition, obsolete parts were disposed of through the vendor return program and by means of sales to independent third parties.

A proprietary part is one that was designed and made by Kenworth or Peterbilt or was made specifically for one of their divisions. If a manufacturer designs a part specifically for sale to Kenworth or Peterbilt but also sells the part to other parties, it is classified as a vendor part by petitioner rather than a proprietary part. In order to protect their dealers from competition, Kenworth and Paccar Parts did not sell Kenworth proprietary parts to anyone except Kenworth dealers. Paccar Parts sent proprietary parts to SAJAC or to a local scrap yard but would not permit them to be used as parts by anyone but petitioner.

The corporate accounting department of petitioner, on October 28, 1977, issued an Accounting Procedure Bulletin which was numbered 27 (A.P. No. 27). This bulletin sets forth the functions and responsibilities of petitioner's employees relating to the identification, control, disposal, and reporting of obsolete and surplus inventory. Obsolete and surplus inventory are described as follows:

1. *Obsolescence* is defined as material that has no present or anticipated future requirements for material as a result of engineering design changes or normal market obsolescence. Obsolence guidelines are:

\*      \*      \*      \*      \*      \*      \*

a. Production
Any part (purchased or fabricated) is obsolete which has no production use. That is, either the part has been superseded or no further requirement for that part is expected.
b. Service
Any part is obsolete when the part has been on hand for 24 months or more and there has been no sales history for the past 24 months. If the part

has been on hand for less than 24 months, it is not considered obsolete unless due to technical obsolescence.

2. *Surplus* is defined as active material on hand in excess of normal production or service requirements.

a. Production

Material on hand is surplus when it is in excess of projected requirements for the next 24 months.

b. Service

The quantity on hand is surplus when it exceeds a *maximum* of the next 60 months' demand. This will be determined by multiplying the past 24 months' average monthly sales quantity by 60 months. If the part has been on hand less than 24 months, multiply the average monthly sales quantity for the number of months on hand by 60 months.

This procedure in no way is intended to set a policy of permitting a five-year supply for all parts. Normal service requirements, determined by prudent and efficient management, should be considerably less than the maximum of 60 months.

\*    \*    \*    \*    \*    \*    \*

3. The identification and disposal of obsolete and surplus material should occur as soon as possible but prior to the next year's annual physical inventory. Some of the techniques and the suggested priority to be used in disposing of the material are as follows:

a. Sell/Transfer to other PACCAR entities
b. Return to vendor
c. Reactivate part (unless for safety reasons)
d. Rework into usable part
e. Sell to distributors/dealers/house accounts
f. Auction
g. Sell to SAJAC or similar inventory management company
h. Mutilate and scrap

Although A.P. No. 27 is dated October 28, 1977, the concepts and procedures described therein were practiced by Paccar Parts from 1975 through 1977, the years in issue in this case.

During the years here in issue and in subsequent years, petitioner sent an average of approximately 25 percent of its obsolete and surplus inventory to SAJAC. Petitioner reacquired an average of approximately 25 percent of the inventory sent to SAJAC during these years. On March 19, 1981, the administration manager at SAJAC had completed an inventory audit and requested information regarding petitioner's buy back time table for certain stored inventory. On March 23, 1981, petitioner replied that the parts were of no use to them and granted permission to scrap these parts.

On September 17, 1982, the district marketing manager of SAJAC wrote a letter to Paccar Parts requesting permission from Paccar Parts to alter or disassemble two parts that had been stored in inventory in August 1981 so these items "could be structured in a manner to be mutually profitable." On September 24, 1982, the materials disposition manager of Paccar Parts denied the request of SAJAC with the explanation that "it is against our policy to disassemble parts and take the chance of a part being mistaken for a take-off or used part."

Respondent in his notice of deficiency to petitioner determined that the losses petitioner claimed on the sales of parts inventory were not allowable with respect to parts transferred to SAJAC due to petitioner's retention of a degree of control over the use and disposition of that inventory. Respondent explained this determination as follows:

During 1976 and 1977 certain of your operating divisions (including Paccar Parts, Dart, and Wagner Mining) entered into agreements with an unrelated firm providing for the sale of certain inventory parts. The agreements provided for the sale of the parts at the prevailing local market price for scrap materials of a like-kind, quality, and weight, but also provided that for a minimum period of 4 years, the operating divisions had the right to repurchase the parts at a price not to exceed 90% of the operating divisions' last acquisition cost, adjusted for inflation. After the expiration of the 4 year period, the unrelated entity agreed to dispose of the parts by destroying or scrapping in a commercially acceptable manner.

You claimed inventory losses from such sales of inventory parts in the amounts shown below:

|  | 1976 | 1977 |
|---|---|---|
| Paccar Parts | $414,591 | $88,580 |
| Dart | - - - | 230,800 |
| Wagner Mining | - - - | 17,103 |
| Totals | 414,591 | 336,483 |

It is determined that you retained such a degree of control over the use and disposition of the inventory parts as to prevent the sales from being closed and completed transactions so that the claimed losses are not allowable. In addition, it is determined disallowances of such inventory losses are necessary in order to clearly reflect income. Accordingly, your income is increased $414,591 in 1976 and $336,483 in 1977.

In an amendment to answer filed October 21, 1983, respondent alleged:

(b) The allowance of the claimed losses does not clearly reflect income for 1976 and 1977 because a bona fide or arms' length sale of some or all of the petitioner's property rights in the inventory parts did not occur in those years. Furthermore, if only some of the petitioner's property rights were sold, the claimed losses were caused by the petitioner's retention of other property rights and, therefore, are not allowable.

### Issue 2. Discounts to Paccint—Section 482

Paccar International, Inc. (Paccint), is a wholly owned domestic subsidiary of petitioner. Paccint was formed on September 1, 1975, and is engaged in the foreign marketing of products manufactured by petitioner's divisions. Paccint was formed by petitioner so that petitioner's international organization could handle sales of Canadian truck production while petitioner would remain eligible, through Paccar International, to take advantage of deferral benefits afforded Domestic International Sales Corporations (DISC) pursuant to sections 991 through 997 of the Code. Paccint conducts the foreign marketing by purchasing from petitioner's divisions (Kenworth, Peterbilt, Dart, and PC & F) and reselling the merchandise in the foreign market. The trucks manufactured by Kenworth were the dominant export products marketed by Paccint during the years in issue. Paccint maintains its principal place of business in Bellevue, Washington. Paccint maintained field organizations in Beirut, Paris, Eastern Europe, Johannesburg, Bogota, and Singapore, and employed specialists in these field offices to assist in marketing abroad.

Prior to September 1, 1975, petitioner conducted its foreign sales through another corporation known as Paccar International which was an operating DISC. Paccar International was a wholly owned subsidiary of petitioner. On September 1, 1975, the DISC became a wholly owned subsidiary of Paccint, and its entire staff and operations were transferred to Paccint. The DISC continued to exist solely as a paper DISC.[4]

Paccint purchased truck units and parts from the manufacturing divisions of petitioner (Kenworth, Peterbilt, Dart, and PC & F) in the amounts of $17,870,000, $59,073,000, and

---

[4] When Paccar International became a subsidiary of Paccint, rather than petitioner, the sales of export property by the DISC were from Paccint to the DISC and therefore the income limitations provided for in sec. 994 were with respect to Paccint and the DISC rather than petitioner and the DISC.

$47,049,000 at dealer net prior to any discount for the period September 1, 1975, through December 31, 1975, and for the years 1976 and 1977, respectively.[5] For purchases made during the period September 1, 1975, through December 31, 1975, and the years 1976 and 1977, petitioner granted Paccint a purchase discount of 10 percent from dealer net. Dealer net is the price that a dealer pays for the product. The 10-percent discount granted to Paccint was not granted to domestic dealers. The 10-percent discount amounted to $1,786,945, $6,209,957, and $4,689,603,[6] respectively, for the period September 1, 1975, through December 31, 1975, and the years 1976 and 1977. Petitioner prepared no pricing analysis during 1975, 1976, and 1977 to support its policy of granting Paccint a 10-percent purchase discount.

In Accounting Procedure Bulletin No. 150 (A.P. No. 150), Paccint set forth the inter-company pricing of trucks. A.P. No. 150, which was revised December 1, 1975, provides in pertinent part:

> The following policies will determine intercompany pricing of trucks manufactured by one company but sold by another company. This bulletin is applicable to truck sales between the U.S. Kenworth Division/Peterbilt Motors Division, Canadian Kenworth, Kenworth Trucks Pty. Ltd., and Peterbilt of Canada. It also applies to truck sales by U.S. manufacturing companies to PACCAR International.

>   *   *   *   *   *   *   *

> All pricing is to be in terms of the distributor net price as set out below;
> * * *

Products were invoiced from petitioner to Paccint at dealer net. The 10-percent discounts to Paccint were made by post-closing entries to the general ledgers of petitioner and Paccint several months after the close of the taxable year and were not

---

[5]The record is somewhat confusing with respect to what is a "truck unit." In the record a "truck unit" is sometimes referred to as the truck sold by petitioner to Paccint, and at other times it is used to refer to the truck plus allied equipment sold by Paccint to its foreign customers. However, since the record is clear that Paccint did not buy allied equipment from petitioner, reference to "truck unit" as used herein with respect to purchases and sales by Paccint refers only to the trucks bought by Paccint from petitioner. When referring to the trucks plus allied equipment in connection with purchases and sales by Paccint, the reference will be to "truck and allied equipment."

[6]Note that these figures represent a little less than 10 percent for the last 4 months of 1975 and a little more than 10 percent for the years 1976 and 1977.

reported elsewhere in the books and records of petitioner and/ or Paccint. Total sales of Kenworth, Peterbilt, Dart, and PC & E for the taxable years 1975, 1976, and 1977 were $477,143,000, $734,755,000, and $1,110,027,000, respectively.

The equipment that Paccint sold in the foreign market included allied equipment which is designed to operate in conjunction with petitioner's trucks as an integrated operating unit and is attached to and built onto a truck unit. Allied equipment was only offered for sale in conjunction with a truck unit. For example, the trailer portion of a van trailer is allied equipment. Allied equipment was bought by Paccint directly from independent manufacturers and not from petitioner. When Paccint would receive an inquiry from a foreign dealer or other foreign customer for a truck for a specific purpose, personnel in its Bellevue, Washington, office would contact petitioner with respect to the specifications for the truck, to determine if the specifications could be met, and the price of the truck. If the truck could be supplied by one of petitioner's divisions, someone in Paccint's Bellevue, Washington, office would contact a builder of allied equipment to be used with the truck to obtain the cost of the allied equipment specified for the truck. If the sale was consummated, when the manufacture of the truck was completed, it would be sent to the manufacturer of the allied equipment, and the truck and allied equipment would be combined and shipped on behalf of Paccint overseas. Paccint would be billed for the allied equipment directly by the unrelated manufacturer of the allied equipment.

The records of Paccint of sales and costs of allied equipment were kept separate from its sales and costs of trucks and parts bought from petitioner. For the period September 1, 1975, through December 31, 1975, and the years 1976 and 1977, Paccint had the following sales of and profit margins on allied equipment:

| Year | Sales | Margin | Margin as percent of sales |
|---|---|---|---|
| Sept. 1, 1975—Dec. 31, 1975 | $5,794,000 | $1,106,000 | 19.0 |
| 1976 | 12,425,000 | 2,201,000 | 17.7 |
| 1977 | 7,707,000 | 1,226,000 | 15.9 |

Parts are sold at a different time and in a different transaction from the sales of the truck units. Paccint purchases its parts from petitioner and is allowed a 10-percent discount on parts.

Petitioner's manufacturing divisions incur the following expenses:

(1) Costs applied (manufacturing costs).
(2) Engineering expense.
(3) Field service expense.
(4) Selling expense.
(5) Parts overhead.
(6) Division administrative expense.
(7) Corporate administrative expense.
(8) Repossession and bad debt expense.

On sales to Paccint as compared to sales to domestic dealers, petitioner incurred less field service expense, selling expense, parts overhead, and repossession and bad debt expense. Petitioner was also relieved of certain expenses associated with selling on the foreign market. The cost of foreign marketing generally exceeds the selling expenses on the domestic market. Although the sales from petitioner to Paccint were domestic sales, Paccint was responsible for marketing the products abroad and maintained a staff of professionals abroad to assist in marketing. The significant differences between selling in the domestic market and selling in a foreign market include the following:

(1) Terms of payment.
(2) Means of protecting risks.
(3) Liens more secure in United States.
(4) Collections more difficult abroad.
(5) Difficult access to legal systems abroad.

There was no direct saving to petitioner of general and administrative expenses as a result of the sales to Paccint. The administrative expenses associated with petitioner's business are typically fixed costs over a wide range of activities and would be affected only slightly, if at all, by the relatively small percentage of sales to Paccint. Interest expense on inventory is proportionately greater for petitioner on sales to Paccint than it is on sales to domestic dealers.

Kenworth, Peterbilt, Dart, and PC & F had total expenses in the years 1975, 1976, and 1977 for field service, selling, parts overhead, repossession, and bad debts of $17,347,000, $21,809,000, and $30,091,000, respectively.

For the period September 1, 1975, through December 31, 1975, and the years 1976 and 1977, Paccint had sales of truck units in the amounts of $18,483,000, $51,662,000, and $34,759,000, respectively. The sales expenses associated with petitioner's sales to Paccint are the same as they would be to domestic dealers.

For the period September 1, 1975, through December 31, 1975, Paccint had sales of parts in the amount of $2,178,000 and a margin of $80,000 based on cost before reduction by the 10-percent discount. For the taxable year 1976, Paccint had sales of parts in the amount of $16,304,000, and a similar margin of $104,000. For the taxable year 1977, Paccint had sales of parts in the amount of $16,750,000, and a similar margin of $204,000.

Parts are sold by Paccint only when the need for a replacement part arises. Paccint also accounts for the sale of parts in a different fashion than the sales of truck units and allied equipment. Upon the sale of a truck unit, Paccint directly invoices the customer. When parts are sold by Paccint, the invoice to the customer is issued by Paccar Parts.

In his notice of deficiency issued to petitioner, respondent determined under section 482 that the 10-percent price discounts petitioner granted to its wholly owned subsidiary, Paccint, are not allowable, giving the following explanation:

During 1975, 1976 and 1977 various manufacturing divisions of Paccar, Inc., (including Kenworth Truck Company, Peterbilt Motors Company, Dart Truck Company and Pacific Car and Foundry Company) sold certain products and parts to Paccar International, Inc. (hereinafter "Paccint"), a wholly owned subsidiary of Paccar, Inc. Such products and parts were ultimately destined for export markets and at the end of each yearly accounting period a ten (10) percent price discount was allowed. Paccar, Inc., Paccint, and various other controlled corporations reported their incomes in consolidated returns, forms 1120, for such years.

Paccint reflected in its reported incomes for such years certain deemed dividend distributions as well as deductions with respect to its wholly owned subsidiary, Paccar (International) Inc., a qualified domestic international sales corporation (DISC).

Under section 482 of the Internal Revenue Code, it is determined the ten percent price discounts granted by Paccar, Inc., to Paccint are not allowable

because such discounts result in evasion of taxes or do not clearly reflect the income of such corporations. Disallowance of such discounts has a causal effect on the deemed dividend distributions and the deductions reported by Paccint inasmuch as such items are dependent in part upon Paccint's and Paccar (International), Inc.'s combined taxable incomes pursuant to sections 991-995 of the Internal Revenue Code.

The determined discount disallowances result in the following adjustments to consolidated taxable income:

|  | 1976 | 1977 |
|---|---|---|
| Deemed dividend distribution |  |  |
| Per return | $3,012,175 | $5,114,549 |
| Per exhibit A | 2,365,113 | 3,309,987 |
| Adjustment | (647,062) | (1,804,562) |

|  | 1975 | 1976 | 1977 |
|---|---|---|---|
| DISC commissions |  |  |  |
| Per return | $2,154,626 | $5,902,532 | $2,508,842 |
| Per exhibit B | 1,256,437 | 2,955,911 | 0 |
| Adjustment | 898,189 | 2,946,621 | 2,508,842 |
| Other uncontested DISC allocation adjustments | 23,051 | 150,343 | (316,619) |
| Net adjustment | 921,240 | 3,096,964 | 2,192,223 |

OPINION

## Issue 1. Transfer of Parts Inventory to SAJAC

Respondent takes the position that petitioner is not entitled to reduce its inventories in the years 1976 and 1977 by the loss it showed on sales of parts inventory to SAJAC. Respondent contends that in substance, no sale occurred because the benefits and burdens of ownership were never transferred by petitioner to SAJAC.[7] Respondent argues that SAJAC assumed the burden of storing and caring for the inventory and thus its role resembled that of a storage agent while Paccar retained the benefits of the ownership of the inventory. Respondent contends further that the transactions were put in the form of sales solely for tax-avoidance purposes and in reality a storage agency relationship rather than a buyer-seller relationship was created between petitioner and SAJAC. Respondent argues

---

[7]See Rev. Rul. 83-59, 1983-1 C.B. 103.

that petitioner retained such a degree of control over the use and disposition of the inventory parts that the purported "sales" could not be classified as closed and completed transactions. According to respondent, the contracts petitioner entered into with SAJAC purport to transfer title, ownership, and risk of loss when in fact petitioner retained all substantial rights of ownership and merely sent slower moving or excess parts to SAJAC for storage.

Petitioner asserts that its transactions with SAJAC constituted bona fide sales and that its retention of rights to the parts inventory amounted to, at most, an option to repurchase at a premium price.

In support of its position, that it "sold" the inventory to SAJAC, petitioner points to specific language in the contract between the parties. Petitioner emphasizes the use of the words "sell," "repurchase," and "selling price." Petitioner points to the language in the second paragraph of the contract, which states: "Title to, property in and ownership of all scrap material shall pass to SAJAC upon delivery * * *. All goods are sold F.O.B. seller's warehouse, and all risk of loss shall be borne by SAJAC" to emphasize the parties' characterization of the transaction as a sale.

It is well settled that the economic substance of the transaction, rather than its form will govern in determining whether a transaction is a bona fide sale for income tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1236 (1981). The Supreme Court in *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978), has clearly set forth the principles to be followed in deciding this issue:

This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers,* 281 U.S. 376, 378 [50 S. Ct. 336, 74 L. Ed. 916] (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591 [68 S. Ct. 715, 92 L. Ed. 898] (1948); *Helvering v. Clifford,* 309 U.S. 331 [60 S. Ct. 554, 84 L. Ed. 788] (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The

Court has never regarded "the simple expedient of drawing up papers," *Commissioner of Internal Revenue v. Tower,* 327 U.S. 280, 291 [66 S. Ct. 532, 538, 90 L. Ed. 670] (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.,* 308 U.S. at 255 [60 S. Ct. at 210]. See also *Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 356 U.S. 260, 266–267 [78 S. Ct. 691, 2 L. Ed.2d 743] (1958); *Commissioner of Internal Revenue v. Court Holding Co.,* 324 U.S. 331, 334 [65 S. Ct. 707, 89 L. Ed. 981] (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner of Internal Revenue v. Duberstein,* 363 U.S. 278, 286 [80 S. Ct. 1190, 4 L. Ed.2d 1218] (1960). [435 U.S. at 572–573.]

The question of whether a sale has occurred for purposes of Federal income taxation requires an examination of whether the benefits and burdens of ownership have been transferred. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. at 1237. This determination is essentially one of fact and is ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. 77 T.C. at 1237; *Derr v. Commissioner,* 77 T.C. 708, 724 (1981); *Baird v. Commissioner,* 68 T.C. 115, 124 (1977); *Deyoe v. Commissioner,* 66 T.C. 904, 910 (1976). It is now well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Derr v. Commissioner, supra* at 722. The "labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties." *Houchins v. Commissioner,* 79 T.C. 570, 589 (1982); see also *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978); *Estate of Franklin v. Commissioner,* 64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976).

Petitioner argues that the cases of *American National Bank of Austin v. United States,* 421 F.2d 442 (5th Cir. 1970), and *Union Planters National Bank of Memphis v. United States,* 426 F.2d 115 (6th Cir. 1970), relied on by respondent, upon close analysis support its position. However, in our view these cases do not support the conclusion advanced by petitioner. In *American National Bank of Austin* and *Union Planters National Bank of Memphis,* the Fifth and Sixth Circuits respec-

tively concluded that "sale and repurchase" transactions involving municipal bonds were in substance loans by the bank to bond dealers on the security of the bonds rather than purchases of the bonds by the bank due to the continued dominion exercised by the purported seller prior to its "repurchase" of the bonds. The Fifth Circuit, in *American National Bank of Austin*,[8] decided that a bank which paid an issuing authority for municipal bonds awarded to dealers who subsequently sold the bonds to their customers was not, for tax purposes, to be considered the owner of the bonds. The court stated that "Only persons having the rights and incurring the

[8]The United States Court of Claims (now the United States Court of Appeals for the Federal Circuit) in 1978 in *American National Bank of Austin v. United States*, 216 Ct. Cl. 92, 573 F.2d 1201 (1978), held that for the years before it (1965 to 1970), the taxpayer was not collaterally estopped by the decision of the Fifth Circuit in *American National Bank of Austin v. United States*, 421 F.2d 442 (5th Cir. 1970), which involved the years 1962 to 1964, to contend that the transactions were in fact sales and repurchases. After the decision of the Fifth Circuit in 1970, the board of directors of the bank informed all bond dealers in the area that it was terminating the business of "taking up" bond issues at the request of successful bidder-dealers, and that all existing options to acquire from the bank must be exercised on or before May 1, 1970, or would terminate. After receiving this notice, all bond dealers except six exercised their options to acquire from the bank all bonds for which the then-existing market prices were in excess of the option prices. The six bond dealers who failed to exercise their option refused to do so even after the bank requested them to do so. The bank subsequently sustained a loss of more than $160,000 on one group of these bonds. Based on these facts, the Court of Claims concluded that the bank had purchased these bonds subject to options by the dealers to acquire the bonds subsequently from the bank. The court concluded that the bank actually bore the "basic risk of ownership of a bond" during the years 1965 to 1970, and that the Fifth Circuit had dealt with a different set of circumstances for tax years 1962 to 1964. The Court of Claims stated:

"The two companion cases now before this court not only involve taxable years different from those that were involved in the earlier *American National Bank of Austin* case, and involve transactions between the plaintiff and bond dealers different from the transactions that were involved in the earlier case, but we have here an additional circumstance of considerable significance that did not appear in the earlier case.

"The evidence in the earlier *American National Bank of Austin* case showed that during the years involved in that case (1962–1964), no successful bidder-dealer, at whose request the plaintiff had paid an issuing authority for a bond issue, subsequently failed to acquire the bonds from the plaintiff. * * *

"Thus, it was the supposed lack of risk on the part of the plaintiff that led the Court of Appeals in the first *American National Bank of Austin* case to conclude that, in substance, the transactions between the plaintiff and successful bidder-dealers during the 1962–64 period were loan transactions. On the other hand, the evidence in our present record shows that, when the crunch finally came and the matter was put to the test, the plaintiff actually bore the 'basic risk of ownership of the bonds.' According to the evidence in this record, six bond dealers declined to exercise their options, the plaintiff had no legal recourse against them, and, as a consequence, the plaintiff sustained a large financial loss.

"It is concluded, therefore, that the doctrine of collateral estoppel is not applicable to the present litigation, that the decision of the Court of Appeals in the first *American National Bank of Austin* case should not control the outcome of the present cases, and that the transactions between the plaintiff and successful bidder-dealers during the 1965–70 period involved, in substance as well as in form, purchases of municipal bonds by the plaintiff, subject to options on the part of the bond dealers to acquire the bonds from the plaintiff."

[573 F.2d at 1206–1207. Fn. ref. omitted.]

risks that ownership of municipal bonds entails may" be considered the owner. 421 F.2d at 451. The court concluded that the "taxpayer's 'ownership' of these bonds was without substance" (451 F.2d at 453), because the purported seller "exercised complete dominion over the bonds after they came into the [buyer's] possession." 421 F.2d at 452. The seller "sold them at his pleasure, at prices he determined, and without reference to the bank * * *. Obviously the inventory of bonds was being held by the bank for the dealers and subject to their disposition." 421 F.2d at 452. The court concluded that a sale did not take place because the basic risk of ownership of the bonds was retained by the transferors. The facts in *Union Planters National Bank of Memphis* were identical to those in *American National Bank of Austin*, except that in that case there were written repurchase agreements under which the bank could require the dealer to repurchase at any time at a price which would guarantee the bank against any loss. In *Austin*, the dealers had only an unwritten option to repurchase and there was no written contract as there was in the case involving the Memphis bank. The Sixth Circuit found that the transaction between the bank and the bond dealers in *Union Planters*, "although characterized as sales-repurchases by the parties, will be regarded as secured loans for federal income tax purposes." 426 F.2d at 118. When a dealer found a customer for the bonds, he would repurchase them from the bank which never refused to resell the bonds although, under the written repurchase agreement, it was not bound to do so.

In our view, the following four factors should be considered in determining the character of the transactions between petitioner and SAJAC: (1) Who determined what items were taken into inventory; (2) who determined when to scrap existing inventory; (3) who determined when to sell inventory; and (4) who decided whether to alter inventory. See *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–1238 (1981).

(1) *What items taken into inventory.*—SAJAC exercised no discretion over what it accepted into inventory and therefore accepted even worthless inventory. If SAJAC intended to be the owner of this inventory, it would have shown some interest in the quality of goods it was purchasing. On the contrary, petitioner was solely responsible for which items in inventory

were transferred to SAJAC. In fact, the record reflects that SAJAC never refused a shipment of parts from any of petitioner's divisions. Thus, with respect to this element we conclude that petitioner behaved as if SAJAC was merely warehousing the inventory for petitioner's future use.

(2) *Scrapping inventory.*—The record reflects that petitioner made all decisions concerning when to scrap the inventory stored at SAJAC. If SAJAC had been the owner of this inventory, it would have been more interested in making this key determination. Even after the expiration of the minimum 4-year period as specified in paragraphs 4 and 6 of the agreement between petitioner and SAJAC, petitioner continued to make the decisions regarding scrapping of inventory. In fact, the parties had tacitly agreed that SAJAC would take no unilateral action regarding scrapping the inventory parts stored at SAJAC. Pursuant to the terms of the agreement, after a period of 4 years, SAJAC went to petitioner to ask permission to scrap the inventory if petitioner had purchased no material from a particular container housing inventory. Petitioner would then decide whether or not the material should be scrapped or saved. Thus, we conclude that in deciding whether to scrap materials held in inventory, petitioner behaved as if it remained the owner of the inventory and as if SAJAC was merely a storage agent.

(3) *When to sell.*—Pursuant to paragraph four of the contract between petitioner and SAJAC, SAJAC is denied the rights to sell the parts in its warehouse to anyone but petitioner for a period of 4 years. In addition, SAJAC is restricted from selling the parts as anything other than scrap once the 4 years have expired. In short, SAJAC is permitted to sell only after petitioner has sanctioned such a sale. It is clearly established that one of the indicia of ownership is the right to dispose of property. We conclude therefore that SAJAC's inability to sell the parts without petitioner's permission leads to the conclusion that petitioner retained the ownership rights in the inventory transferred to SAJAC.

(4) *Alteration of inventory.*—The record reflects that the marketing manager of SAJAC requested permission from petitioner to disassemble or alter items contained in inventory at SAJAC. The marketing manager suggested that such disassembly or alteration might be mutually profitable for SAJAC and

petitioner. Petitioner refused to grant permission for the suggested disassembly or alteration. In our view, the fact that SAJAC even requested such permission indicates that petitioner retained ownership rights in the inventory and that SAJAC was merely a storage facility.

In the instant case, we conclude that the transaction between petitioner and SAJAC did not constitute a sale because petitioner retained dominion and control over the assets transferred to SAJAC for at least 4 years after the initial transfer. During this period, SAJAC was required to retain the inventory transferred. As a matter of practice, the inventory was retained for a longer time. Not only was SAJAC unable to dispose of the assets for at least 4 years but, even after that period expired, when SAJAC requested permission from petitioner to sell the inventory it was not permitted to sell it in usable form. Petitioner also retained the right to require SAJAC to destroy, scrap, dismantle, or mutilate the material not resold to petitioner. In effect, petitioner retains the same control over the inventory that it had before shipping it to SAJAC. The only right SAJAC had with respect to the inventory was to receive an agreed amount for any item petitioner had shipped to a dealer for use as a part. In effect, this payment was no more than a flexible storage fee. Despite the priorities of inventory disposition set forth in A.P. No. 27 which listed selling to SAJAC as a seventh option, the record reflects that petitioner sent inventory to SAJAC as a matter of course in order to retain the parts for future shipment to dealers, but at the same time, to attempt to achieve tax benefits as if the inventory had been sold.

In *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), affg. 563 F.2d 861 (7th Cir. 1977), affg. 64 T.C. 154 (1975), the taxpayer wrote down its excess inventory to an amount it estimated to be its net realizable value which in most cases was scrap value. This Court had found that the taxpayer's actions were in accord with generally accepted accounting principles and therefore in compliance with the best accounting practice in the business. This finding was not challenged, leaving only the issue for the Supreme Court's determination of whether the taxpayer's inventory value clearly reflected income as is also required by section 471. The Supreme Court recognized that Thor valued its inventory at the "lower of cost

or market" which is an acceptable and normal method of inventory valuation. The Court pointed out that "market" as defined in section 1.471–4(a), Income Tax Regs., is "the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer." The Court then discussed the two exceptions to this definition, the first being where the taxpayer has actually offered merchandise for sale at prices lower than replacement cost (sec. 1.471–4(b), Income Tax Regs.), and the second, where the goods are unsalable at normal prices or unsalable in the normal way because of damage (sec. 1.471–2(c), Income Tax Regs.). In *Thor*, the Supreme Court concluded that the taxpayer had offered no objective evidence to verify its estimate of reduced market value. Despite the lower inventory value, the taxpayer retained the items in inventory and continued to hold the goods for sale at original prices. Therefore, the Court held that the taxpayer did not comply with the regulations. Under the holding of the Supreme Court in the *Thor* case, petitioner in this case would not have been justified in writing down its parts inventory which it continued to hold for sale at the original prices.

In our view, the transfer of excess and obsolete inventory from petitioner to SAJAC did not constitute a sale but was a device designed to circumvent our holding in *Thor Power Tool Co. v. Commissioner, supra,* which was affirmed by the Supreme Court.[9] Petitioner was faced with several options. If the excess inventory was carried at its cost on petitioner's books, the amount it would ultimately receive for the inventory would probably be overstated since many of the items would not be sold. If the inventory were scrapped prematurely, it would cost petitioner considerably more than the normal manufacturing cost to reproduce a specifically needed part for petitioner's customers. Petitioner "sold" the inventory to SAJAC and wrote down the value of its inventory in an effort to decrease taxable income by claiming a loss on its return while still having the inventory available when needed. As the Supreme Court stated—

The taxpayer thus sees itself presented with "an unattractive Hobson's choice: either the unsalable inventory must be carried for years at its cost

---

[9] Our opinion in *Thor Power Tool Co. v. Commissioner,* 64 T.C. 154, was filed May 16, 1975.

instead of net realizable value, thereby overstating taxable income by such overvaluation until it is scrapped, or the excess inventory must be scrapped prematurely to the detriment of the manufacturer and its customers." * * *

If this is indeed the dilemma that confronts Thor, it is in reality the same choice that every taxpayer who has a paper loss must face. It can realize its loss now and garner its tax benefit, or it can defer realization, and its deduction, hoping for better luck later. Thor, quite simply, has suffered no present loss. It deliberately manufactured its "excess" spare parts because it judged that the marginal cost of unsalable inventory would be lower than the cost of retooling machinery should demand surpass expectations. This was a rational business judgment and, not unpredictably, Thor now has inventory it believes it cannot sell. Thor, of course, is not so confident of its prediction as to be willing to scrap the "excess" parts now; it wants to keep them on hand, just in case. This, too, is a rational judgment, but there is no reason why the Treasury should subsidize Thor's hedging of its bets. There is also no reason why Thor should be entitled, for tax purposes, to have its cake and to eat it too.

[*Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 545-546 (1979).]

In our view, petitioner's thinly veiled subterfuge of a "sale" to SAJAC does not distinguish its situation from that present in the *Thor* case. In substance, petitioner did not sell its inventory to SAJAC.

Petitioner further contends, apparently in the alternative, that a write-down of its inventory is supported by the holding in *St. James Sugar Co-op, Inc. v. United States*, 643 F.2d 1219 (5th Cir. 1981). In that case, the Fifth Circuit upheld the taxpayer's valuation of its inventory on the basis that market did not exceed net realizable value based on the taxpayer's estimate of the inventory's value in the declining market. Following *Space Controls, Inc. v. Commissioner*, 322 F.2d 144 (5th Cir. 1963), revg. and remanding a Memorandum Opinion of this Court, the Circuit Court upheld the write-down of the taxpayer's inventory to net realizable value based upon section 1.471-4(b), Income Tax Regs. The Court held that St. James Sugar Co-op's valuation was reasonable under the volatile conditions of the sugar market which indicated a decline in market prices. In *Space Controls*, the taxpayer was obligated under a fixed price contract with the Government to manufacture trucks which could not be used by anyone else. Although a bid price was available, the write-down was upheld by the Circuit Court on the basis that the contract constituted a sale in the regular course of business, and the price fixed by the contract was less than the current bid price. In the *St. James*

*Sugar Co-op* case, the Fifth Circuit distinguished *Thor* on the basis that *St. James Sugar Co-op* had produced sufficient objective evidence of the reduced value for the inventory. The facts in *St. James Sugar Co-op* differ markedly from those in the instant case. The taxpayer in *St. James Sugar Co-op* had contracted to sell its complete inventory and therefore could not sell it on the open market. Thus, the value *St. James Sugar Co-op* placed upon its inventory was supported by an objective estimate of the inventory's net realizable value. This valuation is sanctioned within the guidelines of sections 1.471–4(b)[10] and 1.471–2(c),[11] Income Tax Regs., which allow inventories to be reduced under limited circumstances to an objective estimate of the net realizable value.

In the instant case, petitioner does not fall within the guidelines of sections 1.471–4(b) and 1.471–2(c), Income Tax Regs. Since petitioner did not in substance sell its inventory to SAJAC but retained control over it, in effect, petitioner here as in *Thor* is attempting to write down its inventory while still controlling it. Under the holding in *Thor*, this is not permissible.

---

[10]Sec. 1.471–4(b), Income Tax Regs., provides as follows:

(b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market.

[11]Sec. 1.471–2(c), Income Tax Regs., provides as follows:

(c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. (For inventories by dealers in securities, see sec. 1.471–5.) Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.

On the basis of this record, we sustain respondent's disallowance of petitioner's claimed "loss on sale of inventory" to SAJAC.

## Issue 2. Discounts to Paccint—Section 482

The second issue for decision is whether respondent correctly determined under section 482[12] that the 10-percent discounts granted by petitioner to Paccint for the taxable years 1975, 1976, and 1977 should be disallowed.

Respondent contends that the 10-percent discounts granted by petitioner to Paccint represent an impermissible allocation of income from petitioner to Paccint. Respondent's position is that petitioner's sole objective in granting the 10-percent discount was to secure increased DISC deferral benefits that would have otherwise been unavailable to petitioner after the interposition of Paccint between petitioner and the DISC, Paccar International, on September 1, 1975.

Respondent takes the position that by granting 10-percent discounts to Paccint, petitioner was attempting to avoid taxes by shifting to Paccint a larger profit than would otherwise have been available with a resultant larger DISC deferral under the 50-percent combined income method provided for in section 994(a).

After the interposition of Paccint between petitioner and the DISC, petitioner no longer qualified as a "related supplier" of the DISC because it did not engage directly in a transaction with the DISC. See sec. 1.994–1(a)(3)(ii), Income Tax Regs.

After the formation of Paccint, the DISC allocation was based on the profits earned by Paccint since petitioner was no longer a "related supplier" of the DISC. To increase the profits earned by Paccint, petitioner, on sales to Paccint, granted a 10-percent discount from domestic dealer net. After September 1, 1975, the DISC continued to operate solely as a paper DISC

---

[12]Sec. 482 provides as follows:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

which was a wholly owned subsidiary of Paccint.[13]

Petitioner argues that the 10-percent discount was justified because of expenses borne by Paccint and that it was not granted to evade taxes. Petitioner contends that granting this discount does clearly reflect income.

There is no question that petitioner "controlled" Paccint within the meaning of section 482. In our view, the record is clear that petitioner granted the 10-percent discount to Paccint in order to increase Paccint's income which would result in increasing the DISC deferral and reduce the taxes paid by petitioner and its subsidiaries on a consolidated basis. Respondent was therefore justified under section 482 in adjusting the prices charged by petitioner to Paccint if the prices with the 10-percent discount do not clearly reflect petitioner's income.

Petitioner argues that the allowance of the 10-percent discount does clearly reflect income of Paccint and petitioner.

---

[13]After Paccint was interposed between petitioner and the DISC, petitioner's corporate tax manager prepared the following chart which in his opinion contrasts tax consequences resulting from the interposition of Paccint between petitioner and the DISC and the tax benefits the DISC had enjoyed prior to the interposition:

TAX DISADVANTAGE OF NOT USING AN OPERATING DISC

|  | 9/75 – 12/75 | 1976 | 1977 | Total |
|---|---|---|---|---|
| Income had DISC been an "Operating DISC" | $3,696,000 | $8,628,000 | $5,475,000 | $17,799,000 |
| Actual income "Paper DISC" | (2,401,000) | (6,093,000) | (2,998,000) | (11,492,000) |
| Difference | 1,295,000 | 2,535,000 | 2,477,000 | 6,307,000 |
| Dividend to parent | (648,000) | (1,597,000) | (1,598,000) | (3,843,000) |
| Decrease in DISC deferral | 647,000 | 938,000 | 879,000 | 2,464,000 |
| Tax rate | ×.48 | ×.48 | ×.48 | ×.48 |
| Tax disadvantage of "Paper DISC" | 310,560 | 450,240 | 421,920 | 1,182,720 |

Petitioner's corporate tax manager also prepared a chart which in his opinion illustrated the effect on Paccint's income of not giving the 10-percent discount to Paccint:

INCOME FROM OPERATIONS HAD THERE BEEN
NO 10-PERCENT DISCOUNT ON PRODUCTS
PURCHASED FROM PACCAR, INC.

| | |
|---|---|
| 1975 | $2,755,143 |
| 1976 | 6,130,390 |
| 1977 | (717,933) |
| 1978 | 203,650 |
| 1979 | (5,300,458) |
| 1980 | (3,967,845) |
| 1981 | (3,957,629) |
| 1982 | (2,746,729) |
| 1983 | (2,954,547) |
| Income (losses) 1975–1983 | (10,555,958) |

Petitioner states that the savings realized as a result of Paccint's assuming petitioner's wholesaling function can be properly measured by determining expenses incurred by Paccint in the export marketing of petitioner's products and an adjustment for this savings results in a comparable uncontrolled price under section 1.482–2(e)(2), Income Tax Regs.

Section 482 gives respondent broad authority to allocate gross income, deductions, credits, or allowances between commonly controlled organizations if he determines that such allocation is necessary either to prevent the evasion of taxes or in order to clearly reflect the income of such corporations. For a discussion of the history and purpose of section 482, see *Eli Lilly & Co. v. Commissioner*, 84 T.C. 996, 1115–1116 (1985); *Foster v. Commissioner*, 80 T.C. 34, 191–195 (1983), affd. in part and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985). The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled, unrelated taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income of the controlled taxpayer. *Ciba-Geigy Corp. v. Commissioner*, 85 T.C. 172, 221 (1985); *Huber Homes, Inc. v. Commissioner*, 55 T.C. 598, 605 (1971); sec. 1.482–1(b)(1), Income Tax Regs. The standard we must apply is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482–1(b)(1), Income Tax Regs.

Respondent's determination as set forth in the notice of deficiency is presumptively correct and the burden of disproving that determination lies with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). Respondent also has broad discretion in his application of section 482. *Ciba-Geigy Corp. v. Commissioner, supra*; *Eli Lilly & Co. v. Commissioner, supra*; *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965), affg. 44 T.C. 198 (1964). Respondent's determination will be upheld unless petitioner proves it to be arbitrary, capricious, or unreasonable. See, e.g., *Eli Lilly & Co. v. Commissioner, supra*; *Phillip Brothers Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53, 57 (2d Cir. 1970), affg. 52 T.C. 240 (1969); *Ach v. Commissioner*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966). Whether or not respondent has exceeded or abused his discretion turns upon questions of fact. *American*

*Terrazzo Strip Co. v. Commissioner,* 56 T.C. 961, 971 (1971); *Ballentine Motor Co. v. Commissioner,* 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962).

Section 1.482–2(e), Income Tax Regs.,[14] provides that when one member of a controlled group sells property to another member of that group at other than an arm's-length price, an appropriate allocation may be made to reflect an arm's-length transaction. An arm's-length price is the price an unrelated party would have paid. Section 1.482–2(e)(2)(3) and (4) describes three methods of determining an arm's-length price. The first of these methods is the comparable uncontrolled price method.[15]

---

[14]Sec. 1.482–2(e), Income Tax Regs., provides as follows:

(e) *Sales of tangible property*—(1) *In general.* (i) Where one member of a group of controlled entities (referred to in this paragraph as the "seller") sells or otherwise disposes of tangible property to another member of such group (referred to in this paragraph as the "buyer") at other than an arm's length price (such a sale being referred to in this paragraph as a "controlled sale"), the district director may make appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale or disposition. An arm's length price is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. Since unrelated parties normally sell products at a profit, an arm's length price normally involves a profit to the seller.

[15]Sec. 1.482–2(e)(2), Income Tax Regs., provides as follows:

(2) *Comparable uncontrolled price method.* (i) Under the method of pricing described as the "comparable uncontrolled price method", the arm's length price of a controlled sale is equal to the price paid in comparable uncontrolled sales, adjusted as provided in subdivision (ii) of this subparagraph.

(ii) "Uncontrolled sales" are sales in which the seller and the buyer are not members of the same controlled group. These include (a) sales made by a member of the controlled group to an unrelated party, (b) sales made to a member of the controlled group by an unrelated party, and (c) sales made in which the parties are not members of the controlled group and are not related to each other. However, uncontrolled sales do not include sales at unrealistic prices, as for example where a member makes uncontrolled sales in small quantities at a price designed to justify a nonarm's length price on a large volume of controlled sales. Uncontrolled sales are considered comparable to controlled sales if the physical property and circumstances involved in the uncontrolled sales are identical to the physical property and circumstances involved in the controlled sales, or if such properties and circumstances are so nearly identical that any differences either have no effect on price, or such differences can be reflected by a reasonable number of adjustments to the price of uncontrolled sales. For this purpose, differences can be reflected by adjusting prices only where such differences have a definite and reasonably ascertainable effect on price. If the differences can be reflected by such adjustment, then the price of the uncontrolled sale as adjusted constitutes the comparable uncontrolled sale price. Some of the differences which may affect the price of property are differences in the quality of the product, terms of sale, intangible property associated with the sale, time of sale, and the level of the market and the geographic market in which the sale takes place. Whether and to what extent differences in the various properties and circumstances affect price, and whether differences render sales noncomparble, depends upon the particular circumstances and property involved. The principles of this subdivision may be illustrated by the following examples, in each of which it is assumed that X makes both controlled and uncontrolled sales of the identical property: [Examples omitted.]

The other two methods are the resale price method,[16] and the cost plus method. Sec. 1.482–2(e)(1)(ii), Income Tax Regs. A fourth method is provided for by the following language in section 1.482–2(e)(1)(iii), Income Tax Regs.:

(iii) Where the standards for applying one of the three methods of pricing described in subdivision (ii) of this subparagraph are met, such method must, for the purposes of this paragraph, be utilized unless the taxpayer can establish that, considering all the facts and circumstances, some method of pricing other than those described in subdivision (ii) of this subparagraph is clearly more appropriate. Where none of the three methods of pricing described in subdivision (ii) of this subparagraph can reasonably be applied under the facts and circumstances as they exist in a particular case, some appropriate method of pricing other than those described in subdivision (ii) of this subparagraph, or variations on such methods, can be used.

---

[16]Sec. 1.482–2(e)(3), Income Tax Regs., provides as follows:

(3) *Resale price method.* (i) Under the pricing method described as the "resale price method", the arm's length price of a controlled sale is equal to the applicable resale price (as defined in subdivision (iv) or (v) of this subparagraph), reduced by an appropriate markup, and adjusted as provided in subdivision (ix) of this subparagraph. An appropriate markup is computed by multiplying the applicable resale price by the appropriate markup percentage as defined in subdivision (vi) of this subparagraph. Thus, where one member of a group of controlled entities sell property to another member which resells the property in uncontrolled sales, if the applicable resale price of the property involved in the uncontrolled sale is $100 and the appropriate markup percentage for resales by the buyer is 20 percent, the arm's length price of the controlled sale is $80 ($100 minus 20 percent × $100), adjusted as provided in subdivision (ix) of this subparagraph.

(ii) The resale price method must be used to compute an arm's length price of a controlled sale if all the following circumstances exist:

(a) There are no comparable uncontrolled sales as defined in subparagraph (2) of this paragraph.

(b) An applicable resale price, as defined in subdivision (iv) or (v) of this subparagraph, is available with respect to resales made within a reasonable time before or after the time of the controlled sale.

(c) The buyer (reseller) has not added more than an insubstantial amount to the value of the property by physically altering the product before resale. For this purpose packaging, repacking, labeling, or minor assembly of property does not constitute physical alteration.

(d) The buyer (reseller) has not added more than an insubstantial amount to the value of the property by the use of intangible property. See sec. 1.482–2(d)(3) for the definition of intangible property.

(iii) Notwithstanding the fact that one or both of the requirements of subdivision (ii)(c) or (d) of this subparagraph may not be met, the resale price method may be used if such method is more feasible and is likely to result in a more accurate determination of an arm's length price than the use of the cost plus method. Thus, even though one of the requirements of such subdivision is not satisfied, the resale price method may nevertheless be more appropriate than the cost plus method because the computations and evaluations required under the former method may be fewer and easier to make than under the latter method. In general, the resale price method is more appropriate when the functions performed by the seller are more extensive and more difficult to evaluate than the functions performed by the buyer (reseller). The principle of this subdivision may be illustrated by the following examples in each of which it is assumed that corporation X developed a valuable patent covering product M which it manufactures and sells to corporation Y in a controlled sale, and for which there is no comparable uncontrolled sale: [Examples omitted.]

Section 1.482–2(e)(1)(ii), Income Tax Regs., establishes a priority for the application of the pricing methods listed above. *Eli Lilly & Co. v. Commissioner, supra.* The comparable uncontrolled price method must be used first because "it is the method likely to result in the most accurate estimate of an arm's-length price (for the reason that it is based upon the price actually paid by unrelated parties for the same or similar products)." Comparable uncontrolled sales are sales of the same or substantially identical property between uncontrolled buyers and sellers. Sec. 1.482–2(e)(2)(ii), Income Tax Regs.

The regulations go on to provide that if there are no comparable uncontrolled sales, the resale price method is to be used. Sec. 1.482–2(e)(1)(ii), Income Tax Regs. This method involves calculating the arm's-length price of a controlled sale by the resale price to an uncontrolled buyer reduced by an appropriate markup. Sec. 1.482–2(e)(3), Income Tax Regs. The resale price method is most likely to result in an arm's-length price "where a manufacturer sells products to a related distributor which, without further processing, resells the products in uncontrolled transactions." Sec. 1.482–2(e)(1)(ii), Income Tax Regs. If all the standards for the application of the resale price method are not satisfied, either that method or the cost-plus method may be used—

depending upon which method is more feasible and is likely to result in a more accurate estimate of an arm's-length price. A typical situation where the cost-plus method may be appropriate is where a manufacturer sells products to a related entity which performs substantial manufacturing, assembly, or other processing of the product or adds significant value by reason of its utilization of its intangible property prior to resale in uncontrolled transactions. [Sec. 1.482–2(e)(1)(ii), Income Tax Regs.]

If none of the above methods is viable under the facts and circumstances in a particular case, a fourth "appropriate" method may be used. Sec. 1.482–2(e)(1)(iii), Income Tax Regs.

Petitioner asserts that the prices at which it sold to domestic dealers are "uncontrolled prices" since these sales are "uncontrolled sales" as defined in the regulations. However, petitioner contends that these prices unadjusted are not "comparable uncontrolled prices" since there are differences in the circumstances of the sales and the geographic market in which the product is resold. Petitioner contends that when

properly adjusted, these "uncontrolled sales" produce "comparable uncontrolled prices."

Although in disallowing the entire 10-percent discount, respondent in effect used the actual sales to unrelated domestic dealers as "comparable uncontrolled prices," at the trial, his expert witnesses testified that some discount from the dealer net prices is needed to arrive at "comparable uncontrolled prices." The adjustments made by respondent's experts support some discount, but a discount less than 10 percent. Respondent's expert testified that the most accurate result in the instant case was obtained by using the comparable uncontrolled price method on parts and the resale price method on truck units to determine an arm's-length price for the sales between petitioner and Paccint. In applying the comparable uncontrolled price method, respondent's expert compared the parts sold by Paccint in the foreign market with those sold by Kenworth, Peterbilt, Dart, and PC & F in uncontrolled sales. The expert concluded that the following factors which could have an effect on price were the same for Paccint and petitioner's four divisions: quality of the product; character of the intangible property; time of sale; level of the market; and the geographic market in which the sale took place. The expert concluded that the terms and circumstances of sales between controlled and uncontrolled purchasers were not the same, and that this could have an effect on the price.

The expert testified that expenses relating to the cost of goods sold, other than the cost of purchasing merchandise, include engineering expense, field service expense, selling expense, parts overhead, division administrative expense, corporate administrative expense and repossession and bad-debt provisions. The expert found it difficult to determine which costs were avoided when petitioner sold to Paccint rather than to an unrelated purchaser. The expert reasoned that engineering costs would not be significantly reduced as a result of petitioner's sales to Paccint.

The expert concluded that petitioner's discount of 10 percent on sales of parts to Paccint was not justified, and computed the adjustment to the transfer price by adjusting the prices at which trucks and parts were sold to domestic dealers. Using the comparable uncontrolled price method on trucks and parts, the expert concluded that the transfer prices (after the

10-percent discount) from petitioner to Paccint should be increased for 1975, 1976, and 1977 in the amounts of $1,112,000, $4,302,000, and $3,359,000, respectively, for a total increase of $8,773,000.

Respondent's expert also used the resale price method to compute an arm's-length price between petitioner and Paccint on the sales of truck units. Sec. 1.482–2(e)(3)(ii), Income Tax Regs. Respondent's expert did not apply the resale price method to parts because, in his opinion, the sales effort associated with selling units and parts differs dramatically. According to respondent, allied equipment is sold in a bundle at one time while parts are sold continuously over a longer period of time. Pursuant to the resale price method, the expert determined the arm's-length price by taking the "applicable resale price" and reducing it by an amount he determined to be an "appropriate markup percentage." Sec. 1.482–2(e)(3)(vi), Income Tax Regs. The expert concluded that the truck units manufactured by Kenworth, Peterbilt, Dart, and PC & F were most similar to the allied equipment purchased and sold by Paccint in uncontrolled transactions. The expert determined there was similarity in the resales since the type of property involved in the sales was similar; the functions performed by the reseller with respect to the property were the same; the effect on price of any intangible property used by the reseller in connection with the resold property was comparable; and the geographic market in which the functions were performed by the reseller was identical. Sec. 1.482–2(e)(3)(vi)(a)–(d).

Using the resale price method on units and the comparable uncontrolled price method on parts, the expert concluded that petitioner's prices to Paccint should be increased for the years 1975, 1976, and 1977 in the amounts of $824,000, $5,024,000, and $2,964,000, respectively, for a total increase of $8,812,000.[17] Despite prior contentions to the contrary, respon-

---

[17] Respondent's expert computed the figures for the period Sept. 1, 1975, through Dec. 31, 1975, based on the following table:

Analysis of Sale Using Resale Price Method on Units
and Comparable Uncontrolled Price Method on Sales of Parts
To Compute Appropriate Transfer Price on Intercompany Sales
9/1/75 – 12/31/75 (000's omitted)

| Units | Total |
|---|---|
| Unit sales to Paccint—distributor net 9/1/75 – 12/31/75 | $15,772 |

dent on brief argues that the comparable uncontrolled price method should not be used at all in the instant case because a significant difference exists in the level of the market between the sales to Paccint, a wholesaler, and sales to domestic dealers, who are retailers.

Petitioner's expert was of the opinion that applying the comparable uncontrolled price method resulted in a showing that the price petitioner charged Paccint in 1975 was 98.6 percent of the comparable uncontrolled price, for 1976 was 98.7 percent, and for 1977 was 102.6 percent. Petitioner's expert concluded that the controlled price between petitioner and Paccint when expressed as an average for the 3 years, 1975 through 1977, was 99.8 percent of the price indicated

| | | |
|---|---|---|
| Less: Discount | | ($1,577) |
| Net selling price to Paccint | | 14,195 |
| Paccint selling price of units | | 18,483 |
| Less: Net cost to Paccint (above) | | (14,195) |
| Gross margin | | 4,288 |

Margin on unit sales $4,288/18,483 = 23.20\%$
Margin on other purchased equipment sales
$\qquad \$1,106/5,794 = 19.09\%$

| | | |
|---|---|---|
| Paccint sales | $18,483 | |
| Margin at 19.09% | (3,528) | |
| | | |
| Transfer price using margin on other purchased equipment | 14,955 | |
| Transfer price used | (14,195) | |
| Increase in transfer price | | 760 |

*Parts*

| | | |
|---|---|---|
| Total sales of parts to Paccint 9/1/75 – 12/31/75 | 1,027 | [This figure is incorrect.] |
| Less: Discount taken | (103) | |
| Transfer price | | 924 |
| | | |
| Total sales of parts to Paccint 9/1/75 – 12/31/75 | 1,027 | |
| Less: Discount at .0378 rate | (39) | 988 |
| Increase in transfer price on parts | | 64 |
| Total increase in transfer price | | 824 |

Respondent's expert used a comparable computation to arrive at the adjustments for 1976 and 1977. The expert determined that Paccint's margin on allied equipment was 17.71 percent for 1976 and 15.91 percent for 1977.

pursuant to the comparable uncontrolled price method.[18]

Petitioner places great emphasis on the distinction between the domestic wholesaling function that petitioner performs and the export wholesaling function that Paccint performs. Petitioner contends that Paccint incurs greater expenses in servicing the overseas dealer network. Petitioner argues that performing the domestic wholesaling function internally results in a cost of roughly 6 percent of its price to domestic retail dealers, and that Paccint performs the export wholesaling function for petitioner and services the overseas dealer network at a cost of approximately 10 percent of the price to domestic retail dealers. Petitioner claims that Paccint assumed the management burden and risk that it would have otherwise assumed. An additional risk that Paccint assumed in petitioner's view was the possibility that Paccint might not recover its costs. Thus, petitioner argues, Paccint was properly allowed a 10-percent discount from the price at which petitioner sold to domestic dealers to account for the risk that Paccint would not recover its cost in the European market. Petitioner argues that although Paccint did in fact recover its costs and make a profit in 1975, 1976, and 1977, it would have failed to do so without the 10-percent discount in 6 out of 9 years.

However, petitioner also supported its transfer price under the resale price method by using Paccint's sales of allied equipment in computing a proper sales price to Paccint. Using

---

[18]Petitioner's expert based his opinion on the following computation:

|  | 1975 | 1976 | 1977 | Total |
|---|---|---|---|---|
|  | (Figures in thousands) | | | |
| Purchases from PACCAR | $53,593 | $59,073 | $47,049 | $159,715 |
| Discount at 10 percent | (5,359) | (5,907) | (4,705) | (15,971) |
| Controlled price | 48,234 | 53,166 | 42,344 | 143,744 |
| Purchases from PACCAR | 53,593 | 59,073 | 47,049 | 159,715 |
| Export wholesaling expenses incurred by PACCINT | | | | |
| Selling expense | 751 | 1,437 | 1,794 | 3,982 |
| Interest expense on inventory | 167 | 181 | 141 | 489 |
| Division admin. expense | 3,603 | 3,464 | 3,645 | 10,712 |
| Corporate admin. expense | 144 | 144 | 180 | 468 |
| Total expenses | 4,665 | 5,226 | 5,760 | 15,651 |
| Comparable uncontrolled price— Purchases less expenses | 48,928 | 53,847 | 41,289 | 144,064 |

the resale price method, petitioner concluded that the price petitioner charged Paccint was 102.3 percent of the price derived from the resale price method in 1975, 95 percent in 1976, and 98.4 percent in 1977.[19]

Petitioner argues that Paccint is able to markup parts by a greater percentage and obtain a larger margin on parts than on units because the parts are built specifically for petitioner's trucks and the consumer has no other source for acquiring them. Petitioner argues that for this reason, sales of allied equipment to establish an appropriate markup percentage for both petitioner's truck units and parts is prejudicial rather than advantageous to petitioner.

It would be expected that Paccint would receive a different margin on parts than that received on allied equipment. There is testimony in the record to support petitioner's contention that the profit on parts is greater than on allied equipment. Although inconsistent with other positions he takes, respondent argues that Paccint had no profit on parts but all the profit went to petitioner. The record does not disclose the "profit" that Paccint had on parts but from the figures in the record it is clear that its "margin" on parts was less than on allied equipment. This could be true and its profit could be greater since there is some evidence in the record that Paccint's sales expense and certain other expenses in connection with the sale of parts was less than in connection with the sale of allied equipment and truck units. From the record in this case, we conclude that if any "profit" existed from the sales by Paccint of parts using the dealer net price less 10 percent as the cost of those parts, that profit was reflected as Paccint's profit on the records of Paccint.

It is necessary to determine the adjustment, if any, which should be made to the transfer prices of both truck units and parts. Because of the differences in the nature of the items, the proper adjustment, if any, will be separately considered with respect to truck units and parts.

---

[19]Petitioner's expert's computation for 1976 and 1977 resulted in the same profit margin on allied equipment as the computation made by respondent's expert. There is a difference for the period Sept. 1 through Dec. 31, 1975. However, the computation for the period Sept. 1 through Dec. 31, 1975, of respondent's expert is more accurate. Apparently, some of the figures used by petitioner are based on full-year operations using Paccar International costs and sales for the first 8 months of 1975.

While the record shows that sales of allied equipment are comparable to sales of truck units, it is questionable whether sales of allied equipment by Paccint are comparable to its sales of parts. The regulations provide that the most important characteristics to be considered in determining the similarity of resales include the type of property involved in the sale and the functions performed by the reseller with respect to the property. Sec. 1.482–2(e)(3)(vi), Income Tax Regs. The record shows that parts are generally sold by Paccint at a different time than allied equipment. Parts are only sold by Paccint when a customer has a need for a replacement part. In addition, Paccint's accounting method for the sale of parts is different from that for the sale of allied equipment. Paccar invoices Paccint's customers for the parts sold by Paccint, but Paccint directly invoices the customers for the sales of allied equipment. Allied equipment is sold as a means of selling the truck unit. Allied equipment is always sold as part of a package with one of the trucks sold to Paccint by petitioner.

On this record, we conclude that there are no comparable uncontrolled sales prices of truck units or parts due to the difference in the geographic market in which Paccint sales were made and domestic sales were made and the different terms of sales by Paccint, a wholesaler, and petitioner's divisions who sold direct to dealers. Sec. 1.482–2(e)(2)(ii), Income Tax Regs. The uncontrolled sales made by petitioner's divisions, Kenworth, Peterbilt, Dart, and PC & F, were made solely in the domestic market. Although Paccint was a domestic corporation, its sales were solely in the foreign market and the record reflects that added marketing expenses were associated with such sales. Petitioner has not, however, established the added cost of marketing abroad and maintaining a selling staff in foreign nations. Consequently, the use of the "comparable uncontrolled sales" method in this case is not appropriate.

To establish a transfer price on petitioner's sales of truck units to Paccint, we adopt the approach of respondent's expert in determining the resale price method. Based on the computation of respondent's expert, we increase petitioner's transfer price to Paccint of truck units by the amounts of $760,000, $3,927,000, and $1,777,000, respectively, for the period Sep-

tember 1, 1975, through December 31, 1975, and the years 1976 and 1977.

Petitioner's records show that for the period September 1, 1975, through December 31, 1975, and the years 1976 and 1977, petitioner sold parts to Paccint totaling $2,097,441, $16,200,000, and $16,546,000, respectively, prior to the allowance of the 10-percent discount. This discount does not separately show on petitioner's books. However, the 10-percent discount allowed was on the total sales by petitioner to Paccint of trucks and parts. We therefore conclude that the 10-percent discount was allowed on sales of parts. The actual amount of Paccint's sales of parts does not separately show on the documents in this record. However, Paccint's margin is shown and in the context of the records on which it is shown, we conclude and have found this margin to be the difference between the prices charged by petitioner to Paccint before the 10-percent discount allowance and the total sales amount received by Paccint from the sales of parts. Adding the margin shown on Paccint's records to petitioner's undiscounted sales prices to Paccint for parts results in sales by Paccint for the period September 1, 1975, through December 31, 1975, of $2,178,000 and for the years 1976 and 1977 of $16,304,000 and $16,750,000, respectively. As is apparent from these figures, petitioner's profit margin on parts even after the 10-percent discount was in the range of from 11.82 to 15.35 percent for the period and years here involved. This is less than the margin on allied equipment.[20]

---

[20]The actual margin per computation is:

| Parts | Sept. 1, 1975—<br>Dec. 31, 1975 | 1976 | 1977 |
|---|---|---|---|
| Total sales of parts to Paccint<br>(distributor net) | $2,098,000 | $16,200,000 | $16,546,000 |
| Less 10% discount taken | 209,800 | 1,620,000 | 1,654,600 |
| Net selling price to Paccint<br>(controlled price) | 1,888,200 | 14,580,000 | 14,891,700 |
| Paccint selling price on parts | 2,178,000 | 16,304,000 | 16,750,000 |
| Paccint's margin on parts | 80,000 | 104,000 | 204,000 |
| Paccint's profits on parts | 290,000 | 1,724,000 | 1,859,000 |
| Percentage rate of profit on<br>Paccint's resale of parts using<br>the controlled price and cost | 15.35% | 11.82% | 12.48% |

We recognize that some of the expenses which Paccint had in connection with the sale of truck units to its customers were borne by petitioner with respect to parts. The record is clear that the invoicing of parts sales by Paccint was done by petitioner. There is an indication in the record that some parts may have been shipped by petitioner to Paccint customers. However, even considering these factors, we conclude that because of the relatively lower margin between costs and sales price on parts sold by Paccint as compared to allied equipment, the 10-percent discount results in a price of parts to Paccint comparable to a price which would have been charged by petitioner in an arm's-length transaction. We therefore conclude that no adjustment is necessary with respect to parts sales.

Petitioner argues that the adjustment to the prices to Paccint of trucks is so small that we should consider it de minimus. We do not agree. The adjustment in one year is close to 5 percent and in the other years is also substantial in amount. We therefore hold that petitioner's sales price of trucks and parts to Paccint should be increased by $760,000 for the period September 1, 1975, through December 31, 1975, and by $3,927,000 and $1,777,000 for the years 1976 and 1977, respectively. This results in decreasing the discount of petitioner to Paccint, increasing Paccint's costs of goods sold, decreasing Paccint's income, and reducing the DISC deferral available to Paccar and its subsidiaries.

*Decision will be entered under Rule 155.*