CLARK EQUIPMENT COMPANY AND CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clark Equipment Co. v. Commissioner
Docket No. 21912-85.
United States Tax Court
T.C. Memo 1988-111; 1988 Tax Ct. Memo LEXIS 137; 55 T.C.M. (CCH) 389; T.C.M. (RIA) 88111; March 14, 1988; As amended March 14, 1988 *137 Robert D. Heyde,Sonia M. Pawluc, and Cora Nell Haggard, for the petitioners. William E. Bogner and Sheldon M. Kay, for the respondents. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION *138 COHEN, Judge: Respondent determined the following deficiencies in petitioner's corporate income tax: Year
Deficiency
1974
$     93,445.00
1975
2,554,661.00
1976
2,395,109.00
1977
10,454,606.35
After concessions, the primary issue for decision is whether transfers by petitioner of excess parts out of its inventory to a warehousing company were bona fide sales for Federal income tax purposes. If that issue is decided against petitioner, we must also determine whether petitioner, an accrual basis taxpayer, may deduct amounts yet to be paid to the warehousing company to retrieve inventory located at the company's facilities. FINDINGS OF FACT Petitioner, Clarke Equipment Company and Consolidated Subsidiaries (Clark), is a corporation with its principal office in Buchanan, Michigan. Petitioner is a highly integrated manufacturer and distributor of axles, transmissions, *139 material handling equipment, and construction machinery. The availability of parts to service petitioner's long-lasting products is critical to petitioner's business. Petitioner's Central Parts Division (CPD) accordingly maintains extensive inventories of parts and supplies. During the years in issue, petitioner's inventory included parts that would be classified as "excess inventory." These were items for which where was little or no anticipated need because few, if any, orders were placed. Both before and during the years at issue, petitioner had several options in dealing with excess inventory. Petitioner could return the inventory to the vendor who had supplied the excess parts, disassemble the parts into their components to make them more saleable, or sell the inventory to a scrap dealer. When petitioner scrapped parts prior to 1973, it sold the excess parts to bonded scrap dealers. A bonded scrap dealer is a dealer who buys scrap parts and agrees not to resell the parts to third parties. Such dealers agree instead to mutilate or destroy the parts to make them unsalable. They agree to sell the items in question only as scrap metal. Petitioner did not seek to reacquire *140 or repurchase petitioner's parts from scrap dealers after the dealers had purchased them as scrap. The scrap dealers to whom petitioner sold excess inventory accepted everything petitioner chose to sell, metal as well as nonmetal content, but paid petitioner only for the metal content. The scrap dealers paid local scrap price. Sajac Company, Inc. (Sajac), is a long-term warehouser of dormant parts. It was founded as a two-person partnership in 1971 by Jack Lemon (Lemon) and Sam Gingold (Gingold), and was incorporated in 1972 in Wisconsin. Sajac established multiple warehouses in small towns where land and labor were relatively inexpensive. Sajac acquires material from various manufacturers at scrap value, stores this inventory in tis densely packed warehouses, and, if the manufacturers want to "repurchase" any of their material, "resells" the material to the manufacturers at a percentage of their standard cost for the part. Sajac's advertising compared and contrasted what Sajac called the only alternatives for manufacturers with excess parts: maintaining the inventory, scrapping it, or selling it to Sajac. In a brochure entitled "Why Keep Inventory That Doesn't Earn its *141 Keep?" Sajac described the third alternative as follows: THE SAJAC SOLUTION
SAJAC has designed an inventory management system which can give you the benefits of scrapping, plus the benefits of maintaining inventory. The unique SAJAC "banking" system allows you to reduce the inventory to meet future needs. And unlike scrap dealers, SAJAC does not find or develop markets for the parts in purchases. The SAJAC system of inventory management gives you: * Relief from the financial and managerial burden of maintaining an inventory of slow-moving or dormant parts. * A readily accessible source of replacement parts at below manufacturing or replacement costs. * An improved parts service network that provides inventory quickly and efficiently. * A tax-deductible inventory loss. HOW THE SAJAC SYSTEM WORKS
The SAJAC system is based on the buying, holding and selling of excess parts inventories. There are three basic steps to this process. 1. You "Bank" Excess Inventory With SAJAC. You decide what inventory is slow-moving, and sell it to SAJAC at scrap prices. This allows you to devalue the inventory, and take advantage of substantial tax benefits. It also *142 relieves you of responsibility for storing an managing the parts. It's like purchasing new warehouse space at yesterday's construction prices! 2. SAJAC Stores the Inventory. Upon purchase, the inventory is transferred to a nearby SAJAC processing center. Here the parts are prepared for high density storage in SAJAS'c unique warehousing system. The parts are identified and recorded in the SAJAC computerized warehousing log, and are stored in permanent locations until ordered. You receive periodic computer printouts of the parts SAJAC has on hand, so you are always aware of the inventory which is available. 3. You Purchase Inventory From SAJAC. When you order parts which have been sold to SAJAC, you can usually receive them faster than if they were housed in your own warehouse. You order parts through our computerized system utilizing your usual part number. The parts will be retrieved, and shipped within 24 hours via air, truck, rail, bus, APP or UPS. Same day service is available on rush orders. If SAJAC received parts in damaged condition, they can be cleaned, lubricated and painted before shipping. If you wish, all parts can even be shipped in your own new *143 containers. Purchase price is set at a figure below current market value or replacement cost, so SAJAC will always be the most economical source for new parts. On May 25, 1973, Lemon sent Victor Varner (Varner), CPD's purchasing manager, a proposed agreement, which was accepted by petitioner on behalf of CPD on August 9, 1973. That agreement provided as follows: Sec. 1. Sajac will purchase mutually agreed upon inventory at local scrap prices. Sec. 2. Sajac will transport an store its inventory in its warehouse where it will be available for sale to you. In order to assure Clark of a continued availability of pieces from such inventory, Sajac agrees to refrain from selling or disposing of any of the inventory to anyone other than Clark. Sec. 3. You may purchase any portion of our inventory at 90% of your current standard cost at the time we bought the inventory -- plus 5% of that standard cost per year for each year we own the inventory. Sec. 4. Sajac will reduce its selling price to 10% of your standard cost (Sec. 3.) -- plus 5% of that standard cost per year for each year we own the inventory -- whenever your invoiced purchases for the calendar year exceed 10% *144 of our total inventory, valued at your current standard cost at the time we bought it. Sec. 5. This agreement may be cancelled by either party providing 60 days written notice. Upon any such cancellation, Sajac will sell you whatever portion of the inventory you wish to purchase, and will destroy and scrap any inventory which Clark does not repurchase. The repurchase price shall be as described in Sec. 3 and 4. Sec. 6. At any time upon receipt of instructions from you, Sajac will destroy and scrap any portion of the inventory as instructed by you. Your representative may, at your option, be present to witness destruction and scrapping of inventory whether done pursuant to Sec. 5 or Sec. 6 of this agreement.
Sections 2, 5, and 6 of the agreement had been drafted by petitioner's legal department and incorporated in the agreement at petitioner's request. Other divisions of petitioner, in addition to CPD, entered into agreements with Sajac similar to the agreement described above. During the years at issue, petitioner, not Sajac, determined what items from petitioner's inventory would be sent to Sajac. Sajac accepted all items selected and shipped by petitioner; it *145 never refused any shipments during this period. The items selected by petitioner for shipment to Sajac were not limited to metal parts; the items sent included metal, plastic, glass, wood, cartons, and rubber. None of the material was separated by petitioner. Sajac would scrap parts that had arrived from petitioner if those parts had no numbers, were defective, had a flammable content, or had shelf lives such that the parts were unlikely to be sold prior to the expiration of their shelf lives. Sajac would not notify petitioner of such scrapping. On occasion, petitioner would notify Sajac that a part had become obsolete and been replaced. If there were engineering changes in a part that mandated destruction of a certain part, petitioner might advise Sajac to destroy the part. Sajac seldom, if ever, followed such advice. Sajac's reason for not scrapping such parts was that the manufacturer could have made a mistake; Sajac's customers did not always know whether a part would be needed in the future. Since 1968, petitioner had a marketing policy with its dealers known as the "dealer return program." Under this program petitioner's dealers could return a percentage, generally *146 3.6 percent, of their annual parts purchased from CPD for credit. Some of the returned parts were restocked at CPD for possible resale; the remaining items were scrapped. Petitioner decided which dealer return items would stay with Sajac (those that petitioner did not want) and which items would be returned to CPD (those that petitioner wanted). Sajac had no say in the matter. During the years in issue, petitioner exercised its right under the inventory agreement to require Sajac to scrap (i.e., to physically destroy or mutilate) certain parts. Under the dealer return program, petitioner determined whether returned items were stocked or scrapped. If items were "stock," Sajac was to send them to CPD. For "scrap" items petitioner made an additional classification between "Sajac scrap" and "physical scrap." Sajac scrap was to be stored at Sajac. Physical scrap was to be rendered useless by Sajac. These provisions were contained in petitioner's written procedure initiating Sajac's participation in the dealer return program. It was petitioner's understanding that Sajac would hold its parts for possible reacquisition by petitioner and, in fact, the agreement was carried out in *147 that manner, i.e., with Sajac holding the parts until petitioner reacquired them. It was important to petitioner that parts sent to Sajac not be sold to third parties because such parts might re-enter the parts market and compete with CPD's sales of parts. During the years at issue Sajac sent petitioner's parts only to petitioner. It refused to sell petitioner's parts to third parties. Sajac advertised that it would clean, oil, paint, derust, and refurbish parts it received if required by the manufacturer's quality assurance standards. Petitioner expected Sajac to perform these services. In August 1976, Varner of CPD wrote to John Cargen (Cargen) at Sajac with the following directions: Confirming our meeting of this date, the following should be considered part of our agreement on purchasing parts from Sajac. All items prior to shipment by Sajac are to be inspected to insure that every part appears new and can be sold as such. Any item which is rusty or dirty must be cleaned and painted if necessary and properly boxed. The formula for the cost to petitioner of reacquiring its material from Sajac was 90 percent of petitioner's standard cost. If petitioner acquired more *148 than 10 percent of its inventory from Sajac during any calendar year, the prices for reacquisition for the rest of the year dropped to 10 percent. In either case, an amount equal to 5 percent of the standard cost was added for each year the inventory was held by Sajac. Standard cost as used by the parties to the agreement is the cost that petitioner would incur to replace items in its inventory, either by manufacturing the parts itself or by purchasing the parts from one of its vendors. Petitioner's standard cost amounts were set by petitioner. It advised Sajac of the amount to invoice petitioner by sending a price list of all Clark parts stored at Sajac. Petitioner's standard costs could and did fluctuate over time. Sajac did not know the standard cost of petitioner's parts other than from its own history, if any, of transactions with petitioner. If Sajac raised a question about the cost of a part, petitioner would review its records, determine the correct standard cost, and give it to Sajac. Petitioner had the final word on whether its standard cost was correct. The 5-percent feature of the agreement (whereby 5 percent of standard cost was added each year Sajac held the *149 inventory) was dropped by agreement of the parties because petitioner kept its standard cost current, thus making 90 percent of standard cost the maximum amount Clark paid. It never paid more than 90 percent. On one occasion petitioner and Sajac negotiated a special reacquisition cost for a large volume shipment. The agreed upon rate was 75 percent of standard cost. Other than this special rate, the 90-percent amount stated in the agreement was the percent figure used in all of petitioner's reacquisitions from Sajac. The 90-percent price was considered a fair price by petitioner, but not a special price. The Clark parts held by Sajac were old and may have deteriorated or have been subject to engineering changes. The main benefit to petitioner was not the price but the availability in one central location -- Sajac -- of small quantities of parts ready for shipment. The 90 percent price allowed Sajac to make a profit on the agreement with petitioner. If petitioner wanted to reacquire a part from Sajac, it would contact Sajac, and Sajac would determine whether it had a part. Sajac, if it had the part, would ship at petitioner's instructions either to CPD or to a Clark dealer *150 or other customer. Petitioner paid the freight on all parts repurchased. One of Sajac's services to manufacturers was the ability to locate parts at the manufacturer's request and drop ship them directly tot he manufacturer's customer as if the manufacturer had sold the parts to the customers. When Sajac drop shipped Clark parts, it shipped the parts in Clark boxes with Clark labels that petitioner provided. Petitioner also provided house pallets and packing dunnage. Petitioner wanted the parts shipped from Sajac to conform to petitioner's standards and to look like they came out of CPD. The words "CLARK," "GENUINE CLARK PARTS -- CENTRAL PARTS DIVISION," and "CLARK EQUIPMENT COMPANY" appeared prominently on the boxes used by Sajac to ship Clark parts. Upon reacquisition from Sajac, petitioner or its dealers would occasionally reject a part if it was defective or the wrong part. Sajac would in those cases issue credit for the part and might, if the part was valuable, ask the customer to return the part to Sajac, or if the part was not valuable, ask the customer to scrap the part. Petitioner's personnel inspected Sajac's warehouses and reviewed Sajac's methods of picking, *151 packing, and shipping inventory to make certain that parts shipped back to petitioner or to Clark dealers were new and unused. In inventorying its customers' parts, Sajac used the customers' part numbers. Sajac did not have its own numbering system for parts. When petitioner changed its parts numbering system, it notified Sajac of the changed system and told Sajac that "Any stock on hand at Sajac should be converted to the single piece number and the cartons remarked with proper quantities." There was no formal program whereby petitioner would keep Sajac informed of changes in Clark part numbers or engineering changes in Clark parts. Sajac sent petitioner a monthly printout of Clark part numbers and the quantity of such numbers located in Sajac's warehouses. Petitioner offered its parts for sale to its customers at current sale price. Petitioner's average markup from its standard cost for parts to current sales price was 100 percent. Petitioner made a profit on parts reacquired from Sajac and sold to its customers. On its books and records, petitioner accounted for sales to Sajac as it accounted for sales to scrap dealers. Petitioner accounted for purchases from Sajac in *152 the same manner that it accounted for purchases from original vendors. In a notice of deficiency, respondent determined that petitioner's "sales" to Sajac were not bona fide sales for Federal income tax purposes, and disallowed petitioner's deductions for the cost of goods thus "sold." OPINION
I. The Transfers to Sajac
The probable genesis of the transactions in issue here was considered in Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979), affg. 563 F.2d 861 (7th Cir. 1977), affg. 64 T.C. 154 (1975). In accordance with generally accepted accounting principles, Thor Power Tool Co. valued its inventories at the lower of cost or market value. The Supreme Court upheld the Commissioner's position that such valuation of inventory failed to clearly reflect income. The Court observed that "market" value is defined in section 1.471-4(a), Income Tax Regs., as the current bid price for the particular merchandise. Section 1.471-4(b), Income Tax Regs., provides that if there is no open market *153 or an inactive market, the taxpayer must use the available evidence of a fair market price, such as specific purchases or sales by the taxpayer in reasonable volume and made in good faith. In Thor, the taxpayer retained its "excess" inventory and continued to hold the goods for sale at original prices. The Supreme Court noted that the taxpayer had offered no objective evidence to verify its estimate of reduced market value, and it held that the taxpayer had thus failed to comply with the regulations. In this case, as in Thor, petitioner would not have been justified in writing down for tax parts inventory that it continued to hold for sale at original prices. In Paccar, Inc. v. Commissioner,85 T.C. 754, 782 (1985), on appeal (9th Cir., May 7, 1987), we held that a Sajac warehousing arrangement substantially identical to the one at issue was an attempt to circumvent the rationale of our 1975 opinion in Thor Power Tool Co. v. Commissioner, supra, sustaining the Commissioner's previously asserted position. As in Paccar, the ultimate issue in this case is whether petitioner's "sales" to Sajac will be recognized. As in Paccar, *154 we must recognize that "The question of whether a sale has occurred for purposes of Federal income taxation requires an examination of whether the benefits and burdens of ownership have been transferred." Paccar v. Commissioner,85 T.C. at 777; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). As in Paccar, we conclude that the following four factors are of particular significance in determining the character of the transactions between petitioner and Sajac: (1) Who determined what items were taken into inventory; (2) who determined when to scrap existing inventory; (3) who determined when to sell inventory; and (4) who decided whether to alter inventory. Paccar v. Commissioner,85 T.C. at 779; see Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. at 1237-1238. (1) Items taken into inventory. Petitioner selected all items for shipment to Sajac. If there was any possibility that petitioner would sell the inventory in its normal course of business, petitioner shipped the inventory to Sajac *155 for storage. If petitioner did not foresee a future need for inventory, the inventory was sold to scrap dealers. Sajac also exercised no control over items shipped pursuant to petitioner's dealer return program. Petitioner did not separate the metal from the nonmetal items is sent to Sajac. Sajac accepted everything: metal, plastic, glass, wood, cartons, rubber, etc. Petitioner attempts to distinguish Paccar by arguing that after Sajac accepted everything petitioner sent to it, Sajac removed a few items to be scrapped. Nothing in this record or in our findings of fact in Paccar suggests that Sajac did not follow similar procedures in that case. Petitioner also attempts to distinguish Paccar by maintaining that Sajac never refused a shipment from Paccar, whereas Sajac refused "at least one shipment from Clark." The testimony regarding the refused shipment referred to years after the years at issue in this case, and was contradicted by the testimony of one of petitioner's employees. In any event, neither of the purported distinctions compels the conclusion that Sajac was exercising rights inconsistent with ownership in petitioner. [Text Deleted by Court Emendation] *156 Sajac had rights under the contract to take only "mutually agreed upon inventory." It is the continuing control of petitioner over inventory accepted by Sajac that is significant to our decision. (2) Scrapping inventory. Section 5 of the agreement between petitioner and Sajac provided that, upon cancellation of the agreement, Sajac would destroy and scrap all inventory that petitioner decided not to repurchase. Section 6 gave petitioner the right to direct Sajac to destroy and scrap inventory at any time. These provisions were drafted by petitioner's legal department and incorporated in the agreement at petitioner's request. Petitioner argues that Sajac exercised its own judgment in deciding when to scrap; but acquiescence by petitioner does not alter its legal right to supersede Sajac's judgment. (3) Selling inventory. Section 2 of the agreement provided that Sajac would "refrain from selling or disposing of inventory to anyone other than Clark." This provision, which was drafted by petitioner's legal department and incorporated in the agreement at petitioner's request, reflected the conduct as well as the intent of petitioner and Sajac. During the years in issue, *157 Sajac refused to sell petitioner's inventory to third parties, and because Sajac hod no control over petitioner, it could not require petitioner to "repurchase" any amount of parts at any time. Sajac thus exercised no control over when petitioner's inventory was "sold." (4) Alteration of inventory. There is no evidence in the record that suggests that Sajac altered the inventory stored at its warehouses. The record does, however, suggest that Sajac was willing to do so at petitioner's request. Sajac advertised that it would refurbish parts received if required to do so by the manufacturer's quality assurance standards, and correspondence between petitioner and Sajac indicates that Sajac orally agreed to inspect, clean, and paint petitioner's inventory prior to shipment. Petitioner has introduced no evidence indicating that Sajac altered petitioner's inventory in any way inconsistent with petitioner's directions. Petitioner urges us to give greater weight here than we did in Paccar to the transaction's effect on the economic positions of the parties. That effect, however, was presumably a subject of negotiation in determining the contract terms. See Paccar, Inc. v. Commissioner,85 T.C. at 781. *158 We do not doubt that the contract had arm's-length consequences to the parties. The question before us, however, is whether the substance of the relationship created a "sale" of its parts inventory. In any event, we decline to reconsider the approach adopted in Paccar, especially while that case is on appeal. Because petitioner retained dominion and control over its assets, we conclude that the transaction between petitioner and Sajac was not in substance a sale. Paccar v. Commissioner,85 T.C. at 781. Sajac accepted all inventory shipped by petitioner, stored it until petitioner needed it again, sold it to no one other than petitioner, and destroyed or altered it at petitioner's instructions. The only substantial right obtained by Sajac under the agreement was the right to receive an agreed amount for any item "repurchased" by petitioner. On these facts, we hold that petitioner is not entitled to recognize its inventory loss.
II. Acrrual of Deductions
In the alternative, petitioner argues that it is entitled to accrue current deductions for amount to be paid to "repurchase" its inventory from Sajac. *159 Accrual basis taxpayers must deduct expenses in the taxable year in which (1) "all the events have occurred which determine the fact of the liability" and (2) "the amount thereof can be determined with reasonable accuracy." United States v. General Dynamics Corp., 481 U.S.    (1987); section 1.461-1(a)(2), Income Tax Regs. Under this familiar "all events" test, it is fundamental that the fact and amount of the liability must be firmly established, not merely contingent or estimated. United States v. General Dynamics Corp., 481 U.S. at   ; see United States v. Hughes Properties, Inc.,476 U.S. 593 (1986); Dixie Pine Products Co. v. Commissioner,320 U.S. 516, 519 (1944); Brown v. Helvering,291 U.S. 193, 200 (1934). Petitioner focuses on the first requirement of the "all events" test (the fact of the liability) by maintaining that its arrangement with Sajac was, if not a sale, similar to a bailment. As to the second requirement of the test (the amount of the liability), petitioner asserts, without explanation or persuasion, that "the *160 amount of the liability is fixed at 90% of standard cost." Petitioner essentially asks us to recast the transaction in a form without foundation in fact or law. Under the agreement with Sajac, petitioner was under no obligation to "repurchase" any of the parts it transferred to Sajac. Moreover, the record contains no evidence from which petitioner's potential liability to Sajac can be determined with reasonable certainty. At the time of the transfers and at the end of each year in issue, petitioner did not know which parts or how many parts would be reacquired. Petitioner is thus not entitled to current deductions for "repurchase" prices not yet paid to Sajac. We have carefully considered the other arguments of the parties and find them unpersuasive or unnecessary to our resolution of the issues presented in this case. To reflect the foregoing, Decision will be entered under Rule 155.